August KENNAUGH, Petitioner–
Appellant,

v.

David H. MILLER, Superintendent of
Eastern Correctional Facility,
Respondent–Appellee.

Docket No. 01–2281.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 29, 2002.

Decided: April 12, 2002.

Anthony V. Lombardino, Richmond Hill, New York, for Petitioner–Appellant.

Donna Aldea, Assistant District Attorney, Queens County, Kew Gardens, New York (Richard A. Brown, District Attorney, Queens County, Kew Gardens, New York, and John M. Castellano, Assistant District Attorney, Queens County, Kew Gardens, New York, of counsel), for Respondent–Appellee.

Before: LEVAL and CALABRESI, Circuit Judges, and DEARIE,* District Judge.

CALABRESI, Circuit Judge:

Petitioner August Kennaugh appeals from an order of the United States District Court for the Eastern District of New York (Korman, J.) denying his habeas petition. Kennaugh was convicted in the Supreme Court of the State of New York, Queens County, of second degree murder, as well as on two counts of first degree robbery. His conviction arose out of a robbery and murder committed by three men on October 5, 1979. During the course of the robbery, the owner of the restaurant, Guelfo Nelo Terzi, was stabbed to death. Petitioner was arrested four months later. After a jury trial, he was sentenced to concurrent indeterminate terms of 25 years to life for the murder conviction and 8 1/3 to 25 years on each of

---

* Honorable Raymond J. Dearie of the United States District Court for the Eastern District of New York, sitting by designation.

the robbery convictions. The Appellate Division affirmed his conviction without opinion, *People v. Kennaugh*, 92 A.D.2d 1090, 459 N.Y.S.2d 953 (2d Dep't 1983), and leave to appeal to the New York Court of Appeals was denied, 59 N.Y.2d 677, 463 N.Y.S.2d 1036, 450 N.E.2d 259 (1983), as was reconsideration of that denial, 60 N.Y.2d 592, 467 N.Y.S.2d 1038, 454 N.E.2d 133 (1983).

Petitioner seeks habeas relief on two grounds. *See Kennaugh v. Miller*, 150 F.Supp.2d 421 (E.D.N.Y.2001). First, he claims that the District Attorney failed to disclose that two restaurant patrons had observed the perpetrators shortly before the crime and were unable, a year later, to identify petitioner in a lineup. The state court's rejection of his *Brady* claim, he argues, "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). He also asserts that the state court rulings were contrary to or an unreasonable application of *Brady*. Second, Kennaugh contends that the state court admitted in-court identification testimony that was given under impermissibly suggestive circumstances and that the testimony should have been excluded as unreliable under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

## BACKGROUND

In the early hours of October 5, 1979, three young men, two of whom were carrying guns, forced their way into a restaurant after closing and demanded money from the cash register. During the course of the robbery, Guelfo Terzi was stabbed to death while Mrs. Gemma Terzi, Guelfo's wife, and Elio Rusnjak, the bartender, were thrown to the floor, tied up, and guarded by the men. As the robbers fled the restaurant, one man, whom Mrs. Terzi much later identified as the petitioner, pointed a gun at Mrs. Terzi and told her she should not speak with the police or remember his face. After the robbers left, Mrs. Terzi and Rusnjak freed themselves and discovered Mr. Terzi's body.

Kennaugh was arrested on February 3, 1980. At trial, the government presented evidence of Kennaugh's fingerprint on the cash register drawer, his statements to police at the time of his arrest, and eyewitness identifications. Kennaugh did not dispute that the fingerprint belonged to him, but instead attempted to offer an innocent explanation for its presence. The identification testimony was offered by Irving Silver, a restaurant customer, and by Mrs. Terzi. Silver stated that he observed the petitioner in the area of the restaurant approximately an hour before the crime. He also discussed his identification of Kennaugh in a July 1980 lineup and provided an in-court identification of petitioner as the individual whom he had observed the night of the crime.

Mrs. Terzi made an unexpected, in-court identification of Kennaugh as the man who had pointed his gun at her and threatened her when the robbers fled. Approximately seven months prior to trial, Mrs. Terzi had failed to recognize petitioner in a line-up and in several photo arrays. When she began her testimony, she started to cry and the trial court held a recess. The petitioner was seated at the defense counsel's table and Mrs. Terzi may have observed him being taken from the courtroom by court officers after the recess was called. During the recess, Mrs. Terzi informed the District Attorney that she recognized petitioner as the robber who had pointed the gun at her. The trial judge held a conference in his chambers in the course of which the District Attorney told the court and defense counsel that Mrs. Terzi was prepared to make an in-court

identification. Defense counsel requested a *Wade* hearing to determine whether this testimony should be admitted in light of the suggestive setting out of which it arose. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The judge denied the motion and, when the trial resumed, Mrs. Terzi identified the petitioner.

After the jury convicted petitioner, his attorney discovered police reports containing information that two patrons of the restaurant had observed a group of men at the restaurant door buying cigarettes from Mr. Terzi around 1:00 am the night of the robbery and that when the patrons left the restaurant at 1:30 am, they saw the same three men on a nearby street corner. The reports discussed the patrons' inability to identify the petitioner in a photo array and in a lineup in October of 1980. The reports also stated that the patrons told the police that they would be able to identify the men who purchased the cigarettes if they saw them again in person.

Based upon these police reports, Kennaugh filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10. He claimed that the failure to disclose this allegedly exculpatory material violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961). After an evidentiary hearing, the state court denied the motion. The court concluded that the defense counsel was aware that the October 1980 lineup had occurred and that he, therefore, had a duty to inquire about the results of the identification attempt. Additionally, it found that the police reports were not material under *Brady* because the information did not create a reasonable probability that the outcome of the trial would have been different. The patrons were not eyewitnesses to the crime and no evidence linked the men whom the patrons observed to the men who committed the robbery.

At some point after the denial of petitioner's motion, petitioner's mother found two additional police reports discussing interviews with Mrs. Terzi and Rusnjak. In these reports, Mrs. Terzi and Rusnjak each stated that the young men who had bought the cigarettes were the same men who committed the robbery and murder. Although the nature of the state proceeding is not altogether clear, Kennaugh moved to reargue his earlier motion to vacate. He claimed that the new police reports, by connecting the two groups of men, resolved the question of the materiality of the restaurant patrons' failure to identify Kennaugh.

The state court treated this filing as a motion to renew Kennaugh's earlier action, and denied the motion for both substantive and procedural reasons. First, it found that, even taking into account the additional police reports, the result of the trial would not have changed. Order, Motion to Reargue, April 7, 1999, at 2. Second, the court noted Kennaugh's failure to offer a valid excuse for not including the additional police reports in his original motion to vacate, as required by New York State procedural law. *Id.* at 1–2; *see* Crim. Proc.L. § 440.10; *see also Foley v. Roche,* 68 A.D.2d 558, 568, 418 N.Y.S.2d 588 (1st Dep't 1979). Although under New York procedure leave to appeal is available from the denial of a motion to renew, petitioner did not seek leave to challenge this denial.[1]

---

1. The district court states that on September 22, 1998, the Appellate Division denied petitioner's application for leave to appeal the denial of this motion, thus exhausting Kennaugh's *Brady* claim. *Kennaugh,* 150 F.Supp.2d at 427. Our review of the record indicates, however, that the state court denied the original motion to vacate on March 11,

Petitioner filed his habeas petition on August 13, 1999, and his amended petition on March 1, 2000. In these he attacked the admission of Mrs. Terzi's in-court identification as well as the state court's rulings on his *Brady* claim. The district court denied his petition. With respect to the identification testimony, the court found that Kennaugh's claim raised "serious issues," but offered three grounds for denial of the petition. *See Kennaugh*, 150 F.Supp.2d at 432.

The court first found that the state determination was not contrary to clearly established law because the Supreme Court, in the absence of a pretrial identification, had not applied the factors in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), to an in-court identification. *Kennaugh*, 150 F.Supp.2d at 432. The court also determined that even under *de novo* application of *Biggers*, the testimony was admissible. *Id.* at 433. The court stated that the in-court identification was unquestionably suggestive and that, under the five *Biggers* factors, it was unreliable. *Id.* at 434–36. But the district court also considered a sixth factor and since rejected by this court, that looks to the existence of corroborating evidence of guilt in assessing the reliability of identification testimony. *Id.* at 436. This "factor" led the court to conclude that the testimony was properly admitted as reliable. *Id.* Finally, to the extent that the admission of the identification testimony was erroneous, the court found the error to be harmless, given both the strength of the evidence against Kennaugh and Kennaugh's ability to cross-examine Mrs. Terzi about her earlier failure to identify him. *Id.* at 437.

The district court also denied habeas relief from the trial judge's rulings on

petitioner's *Brady* claim. The court agreed that the police reports were not material. It found that the nonidentification information did not directly impeach or undermine the other evidence of guilt and would, therefore, be unlikely to alter the outcome of the case. *Id.* at 430. Because the trial court found an insufficient connection between the men who purchased cigarettes and the perpetrators of the offense, the court also rejected petitioner's claim that the state decision was based upon an unreasonable determination of the facts. *Id.* at 431. The district court noted that, at trial, Mrs. Terzi and Rusnjak never stated that the two groups of men were the same. *Id.* Moreover, to the extent that Kennaugh relied in his petition upon the additional set of police reports, the district court found that its consideration of these reports was procedurally barred on habeas review. *Id.*

The court issued a certificate of appealability for each of the two issues on which petitioner sought habeas relief.

## DISCUSSION

### I. *Admissibility of the In-court Identification*

Mrs. Terzi made an in-court identification of Kennaugh after she was initially unable to pick him out of a pretrial line up and several photo arrays. In addition, immediately prior to her identification at trial, she viewed the petitioner seated at the defense table and may have observed court officers escorting him out of the courtroom. In his habeas petition, Kennaugh argues that the circumstances surrounding Mrs. Terzi's in-court identification were highly suggestive and, consequently, that the state court should have

1998, and that leave to appeal this decision was denied on September 22, 1998. On April 7, 1999, the court denied Kennaugh's second

motion to reargue, treating it as a motion to renew. No further state appeal from the trial court's rulings was taken.

granted his request for a *Wade* hearing to evaluate the reliability of her identification testimony. The state court's failure to do so, Kennaugh argues, was contrary to or an unreasonable application of *Manson*.

We find that we may review Kennaugh's petition under AEDPA because Supreme Court precedent has set forth a due process standard in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), prohibiting the admission of unreliable eyewitness testimony, which governs the admissibility of Mrs. Terzi's in-court identification. We need not, however, determine whether the state court unreasonably failed to apply this principle because its error, if any, was harmless.

A. *AEDPA's Framework*

■ We review a district court's denial of habeas relief *de novo*. *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir.2001). Under the framework established by Congress in the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), habeas relief is available only when the state court judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). "Clearly established federal law, as determined by the Supreme Court," refers to the "holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Francis S. v. Stone*, 221 F.3d 100, 108 (2d Cir.2000). A decision is "contrary to" clearly established federal law as determined by the Supreme Court "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

B. *Clearly Established Federal Law*

■ The threshold inquiry under AEDPA is whether the petitioner "seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams*, 529 U.S. at 390, 120 S.Ct. 1495. That determination will ordinarily be made by the lower federal courts which retain their " 'independent obligation to say what the law is' " under governing Supreme Court precedents. *Morris v. Reynolds*, 264 F.3d 38, 46 (2d Cir.2001) (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495 (emphasis omitted)). That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context. *See, e.g., Gilchrist v. O'Keefe*, 260 F.3d 87 (2d Cir.2001) (which analyzed a habeas petition relative both to the general holding in *Gideon v. Wainwright*, 372 U.S. 335, 340, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), that the right to counsel may only be waived if the waiver is competent and intelligent, and to the more specific, bright-line application of that holding established in *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), which set forth the requirements that must be met before a defendant may proceed *pro se*).

Thus in *Gilchrist* we considered whether a state court unreasonably refused to assign new counsel to a criminal defendant who physically assaulted his court-appointed attorney. In examining the difference between waiver and forfeiture of the right to counsel, we first noted that the Supreme Court had not spoken on the question of forfeiture of this right, and, therefore, that the state court decision was not, when made, contrary to a Supreme Court case that had dealt with "materially indistinguishable facts." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. We then recognized, however, that the Court, through its general precedents in cases such as *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), had established that the right to counsel is fundamental. The remaining question for the *Gilchrist* court was, therefore, whether the state court's failure to appoint new counsel was an unreasonable application of this more general precedent, *Gilchrist,* 260 F.3d at 97. We concluded that it was not. *Id.* at 98; *see also Lainfiesta v. Artuz,* 253 F.3d 151, 154 (2d Cir.2001) (deciding that the refusal to permit co-counsel for the defendant to cross-examine a witness was not an unreasonable application of the "qualified right to counsel of choice" which "emerges out of a defendant's broader right to control the presentation of his defense").

Accordingly, and applying these principles to this case, we must determine whether clearly established law concerning the admission of identification testimony can be derived from Supreme Court precedent at the time of the state court's decision. In doing so, moreover, we are bound to consider both the bright-line rules (set forth in cases like *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)), and the more general due process standard or principles enunciated in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

■ The Supreme Court has considered "the scope of due process protection against the admission of evidence deriving from suggestive identification procedures" in a number of cases besides *Biggers. See Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In each of these cases, the declarant had made a *pretrial* identification and subsequently either testified at trial about the successful prior identification or offered an in-court identification that may have been tainted by the earlier suggestive procedures. From these precedents, however, there has emerged a general principle that, while the reliability of eyewitness identification testimony is usually an issue for jury determination, when the degree of unreliability leads to " 'a very substantial likelihood of irreparable misidentification,' " *Manson,* 432 U.S. at 116, 97 S.Ct. 2243 (quoting *Simmons,* 390 U.S. at 384, 88 S.Ct. 967), the tainted testimony must be excluded to preserve the defendant's due process rights. *See Manson,* 432 U.S. at 114, 97 S.Ct. 2243 ("We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony. . . ."); *compare also Coleman,* 399 U.S. at 5–6, 90 S.Ct. 1999 (finding that an in-court identification following a pretrial lineup identification was not so impermissibly suggestive as to create a substantial likelihood of misidentification), *with Foster,* 394 U.S. at 443, 89 S.Ct. 1127 (finding that repeated confrontations between the declarant and the defendant,

which ultimately led to positive pretrial and in-court identifications, were so suggestive and unreliable as to violate due process), *and Simmons*, 390 U.S. at 384, 88 S.Ct. 967 (recognizing that a defendant has a due process right to be free from an identification that is so unnecessarily suggestive that it may lead to irreparable mistaken identification), *and Stovall*, 388 U.S. at 302, 87 S.Ct. 1967 (same).

In each of these cases, the Supreme Court applied a general due process principle ("The standard, after all, is that of fairness required by the Due Process Clause of the Fourteenth Amendment." *Manson*, 432 U.S. at 113, 97 S.Ct. 2243), which in *Manson*, focused on the necessity of an essential degree of reliability in the identification testimony. We conclude that at the time of the state court determination in the instant case, the Supreme Court had clearly established that federal law comprised *Manson's* general due process standard, mandating that identification testimony must not lead to the likelihood of irreparable misidentification as a result of impermissibly suggestive procedures. *Id.* at 116, 97 S.Ct. 2243. The Supreme Court had, however, earlier in *Biggers*, also adopted a bright-line standard involving certain enumerated factors that needed to be considered in weighing the reliability of some identification testimony. It follows that we must examine whether what the state court did in the case at hand was (a) contrary to federal law as stated in either *Biggers* and *Manson* or (b) constituted an unreasonable application of the law established in either of these two cases.

## C. *"Contrary To" Test*

■ Both *Biggers* and *Manson* involved identification testimony derived from potentially tainted pretrial procedures. And the Supreme Court (unlike our Circuit) has never applied either the standard in *Manson* or the specific *Biggers* test in a context like the one before us, where the only identification occurred in open court. *Cf. United States v. Matthews*, 20 F.3d 538 (2d Cir.1994) (employing the *Biggers* test in a case involving an in-court identification). Accordingly, since *Biggers* and *Manson* did not involve facts that are materially indistinguishable from those in the instant case, the state court's decision cannot be deemed *contrary* to clearly established federal law as defined by the Supreme Court.

Under the two-pronged AEDPA analysis, however, this does not end our inquiry. We must also address whether the state court was objectively unreasonable in refusing to apply either the due process standard in *Manson* or the specific test in *Biggers* to the question of the admissibility of Mrs. Terzi's identification testimony. *Cf. Jones v. Stinson*, 229 F.3d 112, 119–20 (2d Cir.2000) (noting that a state court decision was not "contrary to" Supreme Court precedent because "[t]he Supreme Court has not decided the specific circumstances under which a criminal defendant must be allowed to introduce evidence of prior non-criminal conduct to demonstrate that he did not commit the crime at issue," but further evaluating whether the state court decision "was objectively unreasonable in light of Supreme Court precedent that the opportunity to present a defense is one of the constitutional requirements of a fair trial"). It is that question which we now address.

## D. *Unreasonable Application Test*

The law is not yet fully formed on what it means for a state court to act unreasonably in light of clearly established federal law as defined by the Supreme Court. In *Williams*, the high Court held that a decision may be unreasonable because the

state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495. In *Williams* the narrow issue was "the reasonableness of the application of a legal principle that clearly governed the set of facts presented." *Lurie v. Wittner*, 228 F.3d 113, 129 (2d Cir.2000). The case before us, unlike *Williams*, involves a somewhat different question. We are here required to consider the reasonableness of the state court's failure to *extend* the Supreme Court's general standard for the admissibility of identification testimony to "situations materially different from those considered in the high court's precedents." *Id.*

■ As we noted in *Lurie*, the Supreme Court declined in *Williams* to decide this question of "whether an unreasonable refusal to extend a constitutional doctrine is sufficient to warrant federal habeas relief under AEDPA." *Id.* Nor did *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), a Supreme Court decision which followed *Williams*, fully resolve the issue. Under the circumstances, in *Lurie*, we assumed *arguendo* "an unreasonable refusal to extend a Supreme Court precedent to cover other situations would satisfy § 2254(d)(1)" and permit habeas review. We, nevertheless, concluded that the state court's decision was not in that case unreasonable. *Lurie*, 228 F.3d at 130. In the present case, we address the issue left open in *Ramdass, Williams,* and

*Lurie*. We believe that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed.[2]

Accordingly, we face two questions. One, must the *Manson* holding that due process requires the exclusion of eyewitness identification that entails a very substantial likelihood of irreparable misidentification, though stated in a case involving pretrial identification, be, in reason, applied to initial in-court identifications? Two, must the particular bright-line rule established by *Biggers*, also in the setting of pretrial identifications, be applied in the context of this case as well? We consider the second question first.

■ If there are reasonable ways of meeting the Supreme Court's due process requirements other than by applying the particular rule established in *Biggers*, and if the state court followed such alternative procedures, then the state court's action must be deemed reasonable. Under such circumstances, the specific set of procedures established by the Supreme Court in *Biggers* are not mandated by reason in the context of initial in-court identifications. This is so, moreover, even if those same specific procedures have been required in that very context by lower federal courts dealing with federal cases. *See, e.g., Matthews*, 20 F.3d at 547. In such a situation,

---

**2.** Our position is in precise accord with the language of Justice Kennedy's opinion in *Ramdass* (in which the Chief Justice and Justices Scalia and Thomas concurred), which stated that a "state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass*, 530 U.S. at 165, 120 S.Ct. 2113 (plurali-

ty opinion). That opinion concluded that, in the circumstances of *Ramdass*, the state's failure to extend a prior Supreme Court ruling was not unreasonable. Four members of the Supreme Court (Justices Stevens, Souter, Ginsberg, and Breyer) dissented, and without discussing the extension issue, found the state's action directly contrary to a prior Supreme Court decision, and hence reversible. *Id.* at 207–08, 120 S.Ct. 2113. (Stevens, J., dissenting).

so long as state courts do *something* that reasonably assures that the due process requirements are met, the state decision may not be questioned. Accordingly, we conclude that, though the district court's opinion in the instant case could be misread to mean that the state court did not need to do *anything* to assure that the identification was reliable, the court below was correct in holding that the *particular* test established in *Biggers* was not mandated in cases, like the one before us, that do not involve a challenged pretrial identification.

■ The first question we posed still remains, however. Namely, does the general principle established in *Manson*, that identifications which entail a "very substantial likelihood of irreparable misidentification" are to be excluded, extend to some in-court identifications, or can it reasonably be limited only to pretrial identifications. While no specific set of measures to assure reliability are required, we do not doubt that some in-court identifications are sufficiently unreliable so that the due process concerns expressed in *Manson* mandate that, in reason, measures must be taken to avoid the "very substantial likelihood of irreparable misidentification" that *Manson* sought to prevent. The case before us likely involves just such a dubious in-court identification.

What makes the present case unusual is the combination of the numerous failures by Mrs. Terzi to identify the petitioner and the extreme suggestiveness of the in-court setting. Mrs. Terzi's in-court identification was given under undeniably suggestive conditions, in a context of failed earlier confrontations, that must raise serious doubts about the reliability of her proffered testimony. The fact that she had participated in a lineup as well as several photo arrays and was unable to identify the petitioner during any of these repeated pretrial confrontations, inevitably heightens the risk that her in-court identification was induced by the suggestiveness of the setting in which it occurred. This combination of circumstances certainly raises the question whether here, as in *Foster*, the suggestiveness may have "made it all but inevitable that [the witness] would identify petitioner" whether or not the petitioner was the perpetrator and that "[t]his procedure so undermined the reliability of the eyewitness identification as to violate due process." *Foster*, 394 U.S. at 443, 89 S.Ct. 1127.

The conclusion, that reason requires that the *Manson* standard be applied is, moreover, supported by decisions of this Court and of other Circuit Courts in similar cases.[3] In *Matthews*, for example, we applied the *Biggers* analysis to the in-court identification testimony of a witness who had failed to recognize the defendant in a pretrial photo array. *Id.* 20 F.3d at 547. We relied upon the *Biggers* factors to satisfy the due process standard in *Manson* and stated that "[w]here the circumstances of either a pretrial or an at-trial identification are suggestive, reliability is the linch-

**3.** The views of Circuit Courts are relevant because, as *Williams* stated, the lower federal courts retain their "independent obligation to say what the law *is*" under governing Supreme Court precedents. *Williams*, 529 U.S. at 411, 120 S.Ct. 1495 (internal quotation marks omitted); *see also Gilchrist*, 260 F.3d at 97 ("[W]e note that our determination that the state courts were not unreasonable in [their decision] is additionally supported by the fact that other Circuits have examined similar factors in arriving at similar results."); *Cruz v. Miller*, 255 F.3d 77, 85 (2d Cir.2001) ("Although our inquiry ... is to determine whether the state courts reasonably applied clearly established Supreme Court law, we think it appropriate to make some examination of how the federal courts of appeals have analyzed the issue....").

pin for determining admissibility." *Id.* Similarly, the Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits have held that in-court identification testimony in the absence of a pretrial identification must satisfy the *Manson* reliability standard, either by meeting the *Biggers* requirements or in other ways. *See United States v. Rogers,* 126 F.3d 655, 658 (5th Cir.1997) ("The Due Process Clause protects accused individuals from the use against them of evidence derived from impermissibly suggestive procedures. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).... The gravamen of the determination is fairness and reliability." (internal quotation marks omitted)); *United States v. Murray,* 65 F.3d 1161, 1168–69 & n. 6 (4th Cir.1995) (assessing the likelihood of irreparable misidentification from an initial in-court identification by relying upon the *Biggers* factors); *United States v. Hill,* 967 F.2d 226, 232 (6th Cir.1992) ("[T]he *Biggers* analysis applies to ... in-court identifications for the same reasons that the analysis applies to impermissibly suggestive pre-trial identifications. The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial."); *United States v. Rundell,* 858 F.2d 425, 426 (8th Cir.1988) ("A due process challenge to an in-court identification therefore requires a two-step determination: whether the challenged confrontation was impermissibly suggestive and, if so, whether the identification was nonetheless reliable under the totality of the circumstances."); *Code v. Montgomery,* 725 F.2d 1316, 1319 (11th Cir.1984) ("In order for

petitioner to prevail [on his habeas claim], he must convince us that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.' " (quoting *Simmons,* 390 U.S. at 384, 88 S.Ct. 967)). In *United States v. Domina,* 784 F.2d 1361 (9th Cir.1986), the Ninth Circuit rejected any direct application of the *Biggers* factors to in-court identifications and stated that "[t]here is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification." *Id.* at 1369. But the Ninth Circuit, nonetheless, found applicable the more general *Manson* standard that the in-court identification procedure must not be so "unnecessarily suggestive and conducive to irreparable misidentification as to amount to a denial of due process of law." *Id.* (citing *Stovall,* 388 U.S. at 302, 87 S.Ct. 1967 (internal quotation marks omitted)).

To say that the general due process standard established in *Manson* must be applied to the identification testimony in cases like the one before us still leaves state courts, in a habeas context, free to adopt any number of non-*Biggers* procedures designed to ensure the reliability of such testimony. One example of such alternative methods will suffice. Some courts have relied upon the test applied by the lower court in this case, which considered a sixth factor in the *Biggers* analysis and looked to whether sufficient independent evidence of the defendant's guilt existed to support the reliability of the identification. Although we have recently rejected this "sixth factor" approach as a matter of federal law in this circuit, choosing instead a harmless error approach, *Raheem v. Kelly,* 257 F.3d 122, 140 (2d Cir.2001), it seems likely that under the AEDPA, a state court that used a "sixth factor" analysis would be applying the

*Manson* requirements in a perfectly reasonable way.

▮ In the instant case, it is dubious whether the state court did anything at all to safeguard the due process protections stated in *Manson.* But we need not examine that question further, for, as the district court correctly found in its alternative holding, any error the state court may have made here was harmless. The evidence of Kennaugh's guilt independent of Mrs. Terzi's identification was powerful. His fingerprint was found at the scene of the crime and, despite petitioner's explanation that his print had been left there months earlier, expert testimony made clear that it was extremely unlikely that the fingerprint could have been more than a few days old. Irving Silver identified Kennaugh as being present in the area less than an hour before the murder. At the time of his arrest, the petitioner provided contradictory statements to the police as to whether or not he had ever been inside the restaurant. When we combine the powerful independent evidence of petitioner's guilt, with the fact that on cross-examination, the petitioner was able effectively to challenge the credibility and reliability of Mrs. Terzi's in-court identification, we are bound to conclude that any error that there may have been in failing to test directly the reliability of Mrs. Terzi's testimony was harmless.

## II. *Brady Material*

▮ In his habeas petition, Kennaugh argues that the state court's denial of his post-trial motion to vacate and of his subsequent motion to renew were based upon an unreasonable determination of the facts, and also constituted an unreasonable application of *Brady.*

▮ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the sup-pression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

We agree with the district court that the state judge's finding—that no evidence existed to connect the men who bought cigarettes with the men who perpetrated the crime—was not based upon an unreasonable determination of the facts. At trial, neither Mrs. Terzi nor Rusnjak testified that the young men who purchased the cigarettes were also the perpetrators. Further, when the prosecution specifically asked Rusnjak if the men were the same, he responded "I cannot say. They may have been in the place, but I would say a lot of people come and go. I cannot say that I remember. I don't know." Trial Tr. at 114.

▮ To the extent that Kennaugh's *Brady* claim relies upon the state court's failure (in assessing his motion to renew) to consider the second set of police reports, which he asserts contradict the above mentioned trial testimony, his claim

was procedurally barred in the state court. That court clearly relied upon independent and adequate state procedural grounds to deny the motion to renew. *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Moreover, our consideration of this claim is also prohibited because Kennaugh did not seek leave from the trial court to appeal the denial of his motion to renew and the time for such an appeal has expired. His claim is, therefore, procedurally barred from our review. *See Teague v. Lane,* 489 U.S. 288, 297–98, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).[4]

## Conclusion

Although the state court may have unreasonably failed to apply the governing federal law as defined by the Supreme Court in *Manson,* we conclude that any such failure was harmless. We also hold that the state court rulings concerning the *Brady* material, to the extent that our review of this issue is not procedurally barred, did not constitute an unreasonable application of *Brady.* The judgment of the district court is, therefore, AFFIRMED.

---

4. Even if we could consider both sets of police reports, we would agree with the district court—for the reasons it gave—that the failure to disclose the patrons' nonidentification of the petitioner was not a violation of *Brady.*