Louis GROTTO, Petitioner–Appellee,

v.

Victor HERBERT, Superintendent, Collins Correctional Facility, Respondent–Appellant.

Docket No. 02–2343.

United States Court of Appeals, Second Circuit.

Argued: Nov. 15, 2002.

Decided: Jan. 14, 2003.

Alex Smith, Middletown, NY (Robert N. Isseks, Middletown, NY, on the brief), for Petitioner–Appellee.

Eric A. Johnson, Assistant Solicitor General, Albany, NY (Eliot Spitzer, Attorney General of the State of New York, Caitlin J. Halligan, Solicitor General, Daniel Smirlock, Deputy Solicitor General,

Robin A. Forshaw, Assistant Solicitor General, Albany, NY, on the brief), for Respondent–Appellant.

Before: KEARSE, McLAUGHLIN, and SOTOMAYOR, Circuit Judges.

KEARSE, Circuit Judge.

Respondent Victor Herbert, superintendent of New York State's Collins Correctional Facility (the "State"), appeals from a judgment of the United States District Court for the Northern District of New York, David N. Hurd, *Judge,* granting petitioner Louis Grotto ("Grotto") a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the ground that the state trial court deprived him of due process when it denied his motion, after he had rested his case, for permission to reopen and for a continuance in order to present additional evidence. The district court ordered the State to release Grotto unless it granted him a new trial. On appeal, the State contends that the trial court's denial of Grotto's motion for a continuance and permission to reopen his case was not an unreasonable application of Supreme Court precedent. For the reasons that follow, we agree, and we therefore reverse the judgment granting the writ.

## I. BACKGROUND

From about 1986 to 1993, Grotto lived in Ulster County, New York, with his girlfriend Kimberly O'Brien, their daughter A.G., and O'Brien's daughter from a previous relationship, J.C. In May 1993, O'Brien told her mother that she planned to leave Grotto that summer. J.C., who was then 12 years of age, urged O'Brien not to delay, saying, " 'You can't wait for the summer. You've got to leave now.' ... 'We've got to leave now because Lou is doing things to A[.G.].'" (Trial Transcript ("Tr."), at 76.) J.C. also said that Grotto had sexually abused J.C. when she was 10–11 years old.

At Grotto's state-court trial, O'Brien testified that in that May 1993 conversation, A.G., who was then six years old, confirmed J.C.'s statement that Grotto had been abusing A.G. A.G. told O'Brien that Grotto had been touching her in ways she did not like and, in particular, that he had had sexual intercourse with her at the townhouse of Grotto's sister Linda Grotto Noe ("Linda") on Linda's wedding day, August 22, 1992.

Grotto was indicted in 1993, and tried in 1994, on charges of first-degree rape, first-degree sexual abuse, incest, and two counts of endangering the welfare of a child. He denied all accusations and sought to show that he was not even present at Linda's Highland, New York townhouse on August 22, 1992, the place and date of his alleged intercourse with A.G. The jury found Grotto guilty on all counts, and he was sentenced to a total of 6–18 years in prison. The principal focus of this appeal is the proceedings with regard to evidence as to whether Grotto was present at Linda's townhouse on August 22, 1992.

### A. *The Prosecution's Case*

The prosecution's principal trial witnesses with respect to the events on Linda's wedding day were O'Brien and A.G. O'Brien testified, *inter alia,* that Grotto, as a wedding gift to his sister, had agreed to serve as the wedding photographer. The wedding ceremony was to be performed in judicial chambers. O'Brien testified that on the morning of August 22, Grotto left their Wallkill, New York home at about 7:00 a.m. with his camera, taking A.G. with him. Grotto told her he was leaving early in order to take pictures at Linda's home, and that he would take pictures in the judge's chambers and later at the reception.

A.G. testified that Grotto had begun touching her genitals when she was five years of age. He sometimes touched her only with his hand and sometimes placed his penis in her vagina. She testified that on the morning of Linda's wedding, she and Grotto went to Linda's townhouse, where other members of the Grotto family had convened in preparation for the wedding, and that Grotto took pictures before the family left for the wedding ceremony. A.G. testified that when the other members of the family had gone, Grotto took her into the guest bedroom, undressed himself and her, and engaged in sexual intercourse with her.

Grotto then took A.G. into the bathroom and washed her genital area. They then got dressed and went to the wedding ceremony.

The prosecution's other witnesses included a physician who examined A.G. after her accusations about Grotto in May 1993. The doctor testified that A.G.'s hymen had been perforated and that only remnants of her hymenal tissue remained. That condition was consistent with A.G.'s report of penetration, although it could instead have been caused by vigorous physical activity such as bicycling or horseback riding.

The prosecution also introduced photographic evidence that it had received from Grotto in response to a pretrial discovery demand for "[p]hotographs taken by the defendant on the 22nd day of August, 1992, in the course of Linda Grotto's wedding[, and] all of the negative [sic] of photos taken by the defendant at the wedding." (Prosecution's Demand dated November 15, 1993.) These exhibits included two strips of photographic negatives, People's Exhibits 11 ("PX 11") and 12 ("PX 12"). PX 11 contained four exposures, numbered 9, 10, 11, and 12, the first three of which showed scenes at Linda's townhouse; the fourth, negative # 12, showed the outside of the New Paltz, New York courthouse in which the wedding ceremony took place. Linda later testified that the picture shown in negative # 12 had been taken in front of the courthouse in order to memorialize where she and Kenneth Noe ("Kenneth") were about to be married. Linda testified that she believed that picture was taken by Grotto.

PX 12 contained four exposures, numbered 13, 14, 15, and 16, all of which were taken at the wedding ceremony. Kenneth later testified that he believed Grotto had taken those pictures. Another defense witness, Lisa VanOyan, testified that she had not seen anyone other than Grotto taking pictures at the ceremony.

### B. *Grotto's Defense Case*

Grotto testified in his own behalf and called as his principal witnesses his mother Jean Grotto ("Jean"), his brother Ralph Grotto ("Ralph"), his sister Linda, and Kenneth. All of these witnesses testified that on August 22, neither Grotto nor A.G. had been at Linda's townhouse before the wedding.

Linda and Kenneth testified that the only family members at the Highland townhouse on the morning of August 22 before the wedding were themselves, Linda's parents who lived in Florida, and Ralph with his wife Rochelle Grotto ("Rochelle") and young son Philip, all of whom lived in Rochester, New York. Shortly before 10 a.m., Linda, Ralph, their father, and Kenneth drove to New Paltz for the wedding ceremony, leaving Jean, Rochelle, and Philip at the townhouse; Jean and Rochelle were to prepare the house for a celebratory brunch that would precede the reception that was to be held that afternoon at the Officers' Club at Stewart International Airport. Linda, Ralph, and Kenneth testified that neither Grotto nor

A.G. had been at the townhouse that morning but arrived at the courthouse in New Paltz 5–10 minutes after Linda, Ralph, and Kenneth.

On cross-examination, Ralph was asked about what photographs had been taken during the wedding day. He did not recall that any pictures had been taken at the townhouse before the ceremony. When shown PX 11, however, he testified that ## 9–11 appeared to have been taken at the townhouse and that # 12 appeared to have been taken at the ceremony. Ralph did not know who took those pictures.

Jean Grotto, mother of Grotto, Ralph, and Linda, testified that she had spent the night of August 21 at Linda's townhouse. On the morning of August 22, Jean was at the townhouse until her husband, Linda, Kenneth, and Ralph left for the ceremony in New Paltz. Then Jean and Rochelle (taking young Philip with them) went shopping for food, drink, and flowers for the brunch. At no time did Jean see Grotto at the townhouse on August 22.

Grotto testified that he was not at the townhouse at all on August 22. He stated that he and A.G. left their Wallkill home at about 9:30 a.m. that day and went directly to New Paltz, arriving at the courthouse at about 10 a.m. to attend the wedding ceremony. After the ceremony, A.G. went to the townhouse; Grotto, who was dressed informally, went home to Wallkill to change his clothes. Both Grotto and A.G. attended the wedding reception that afternoon.

Kenneth testified that he and Linda had previously arranged for Grotto to be their wedding photographer. Grotto "was the one who was supposed to take the photographs for [the] wedding" (Tr. 397); "[w]e had asked him to do this" (id.; see also Linda's testimony at Tr. 323 ("We asked Louis to take pictures, he said yes.")). Grotto testified that he had considered

himself the official photographer for the wedding and had taken many pictures of the festivities. He was unable, however, to identify any particular picture as having been taken by him. He and his witnesses also testified that he was not the only person taking pictures on August 22. Ralph, and possibly others, had taken photographs at the townhouse, the courthouse, and other sites.

### C. Grotto's Motion for a Continuance and Leave To Reopen

At approximately 7:00 p.m. on the third day of trial testimony, having presented his witnesses and introduced several photographs in evidence, Grotto rested his case. The trial judge then explained to the jury that it had now heard all of the testimony and that the attorneys would make their closing arguments the next day:

> Ladies and Gentlemen, thank you for your patience tonight. We were able to finish the testimony. We will have closing arguments and final instructions of the Court tomorrow. The People have rested their case in chief earlier, the defense has now rested its case. You've heard all the testimony, we have all the evidence in the record.

(Tr. 524–25.)

On the following morning, Grotto moved to reopen his case, requesting a continuance in order to present additional evidence characterized as "newly discovered." (Tr. 531.) Defense attorney James W. Winslow pointed out that the prosecution, having elicited testimony from defense witnesses that Grotto had taken the fourth picture on the four-negative strip introduced as PX 11, would undoubtedly argue that Grotto must also have taken the first three pictures on that strip, which were taken at the townhouse. Winslow stated

that, during the previous night, prints of two of the negatives that were part of PX 11 "were found" (*id.*) and had handwriting on the back that Grotto's "family believes[ is] Rochelle's writing" (Tr. 533). He requested a continuance in order to determine from Rochelle whether or not the handwriting was hers and then to have her testify that the pictures were taken not by Grotto but by Ralph:

> MR. WINSLOW: .... Today is Friday. Our first request would be that there be a continuance until Monday morning so that these photos and the writing on the back of them can be presented to Ralph and Rochelle so that they can either verify or not that it is, as my client's family believes, Rochelle's writing.

(Tr. 532–33.) Winslow explained:

> [T]he testimony would be that ... it was Ralph who took all four of those photographs ..., that that film was taken back to Rochester when [Ralph and Rochelle] returned there after the wedding, and that once those negatives were made into pictures, that they were sent down here after being inscribed ....

(Tr. 535.)

In the alternative, Winslow asked for a continuance until 2 p.m. that day in order

> to fax up [to Rochester] the reverse, the rear of those two pictures so that we can determine with certainty or as much as we can whether or not, in fact, that is Rochelle Grotto's handwriting, and then immediately have Rochelle and Ralph Grotto get on a plane and come down here to testify at two o'clock, if at all possible.

(Tr. 533–34.)

As a third alternative, Winslow sought permission to call as a witness immediately Renee Planke, whom he described as a "niece" or "a family member of the Grot-

tos" (Tr. 535, 533). Winslow stated that Planke had received a card sent by Ralph and Rochelle; that Grotto's family believed the handwriting on the card was that of Rochelle (*see* Tr. 533); and that to Winslow's confessedly inexpert eye, the handwriting on the "newly discovered" pictures and that on the card appeared to be the same or similar (*see id.*). Winslow proposed to have Planke identify the writing on the card as that of Rochelle; then

> to show her ... the two photographs that were found in the album last night and to ask her to identify whether or not from the card that she received that she believes it's the same handwriting as is on the back of the pictures.

(Tr. 535–36.)

The prosecution opposed any continuance. The Assistant District Attorney ("ADA") pointed out that PX 11, containing the negatives in question, had been introduced prior to the luncheon break the day before. He argued "that that evidence was being developed as they continued to call their witnesses." (Tr. 534.) He also pointed out that Rochelle had been one of the witnesses listed in Grotto's pretrial list of witnesses but simply was not called to testify.

The trial judge denied Grotto's requests for a continuance and for permission to reopen the evidence. As to the proposed testimony by Rochelle that the handwriting on the back of the prints was hers, the court stated that "the evidence that the defense ... seeks to introduce now after the defense has rested ... is hardly conclusive with respect to the defendant's guilt or non-guilt ...." (Tr. 536.) The court stated that Grotto's guilt was also not conclusively shown by the evidence as to the sequence of shots shown on the negatives, and that each side was free to argue what inferences the jury should draw. The court denied Grotto's request

to reopen the evidence to call Planke as a witness, indicating that it was unpersuaded that Planke would have sufficient expertise "to make the comparison of the two handwritings and draw the conclusion that the handwriting is Rochelle's." (Tr. 551.)

The court stated further that the supposedly new evidence should have been discovered by Grotto earlier:

[I]t seems to the Court this issue of the negatives and the sequence of the negatives has been on the table in this trial from virtually the first day, and that it was incumbent upon the defense to move more expeditiously if it wished to challenge that any more than it has already done by its examination and cross-examination of witnesses.

(*Id.*)

### D. *Summation, the Jury's Verdict, and Subsequent Proceedings*

In his summation, the ADA argued, *inter alia*, that Grotto's presence at the townhouse on the morning of Linda's wedding was shown directly by the testimony of A.G. and was supported by several pieces of circumstantial evidence. The ADA argued, *inter alia*, that, given the testimony of Grotto, Linda, and Kenneth that Grotto was to be the official photographer for the wedding, and the testimony of the defense witnesses that Grotto was on good terms with every member of his family, their testimony that he had not been at Linda's house at all, for any of the pre- or post-wedding festivities, was highly implausible.

In addition, as anticipated by Winslow, the ADA pointed to the sequence of pictures shown by the negatives in PX 11. The first three exposures on that negative strip were pictures taken at Linda's townhouse; the fourth exposure showed the courthouse, a picture that Linda said Grotto had taken. The ADA argued that "the fact of their being together on that exhibit tells you that the person who took this picture was the same one who took all these other pictures at the house," and that this made it clear that Grotto was at the townhouse on the morning of the wedding. (Tr. 599.)

The jury found Grotto guilty of all the charges against him. Immediately after the verdict was rendered and in several applications thereafter, Grotto moved to set aside the verdict on the basis that the trial court should not have denied his request to reopen his case and present the new evidence that prints of two of the PX 11 negatives bore the handwriting of Rochelle. All of his motions were denied.

The Appellate Division affirmed Grotto's conviction, and leave to appeal to the New York Court of Appeals was denied. As to the contention that Grotto should have been allowed to reopen the evidence, the Appellate Division ruled

that [the] County Court acted well within its discretion in denying defendant's motion to reopen the proof after both sides had rested, in order to produce evidence as to photographs that had not only been in defendant's possession at all times but which had for months been the subject of an outstanding prosecution discovery demand . . . .

*People v. Grotto*, 223 A.D.2d 758, 759, 636 N.Y.S.2d 436, 438 (3d Dep't), *lv. denied*, 87 N.Y.2d 1020, 644 N.Y.S.2d 153, 666 N.E.2d 1067 (1996).

### E. *The Present Habeas Petition*

After exhausting his state remedies, Grotto filed his present habeas petition in the district court pursuant to 28 U.S.C. § 2254, requesting that his conviction be vacated on the grounds that (1) the trial court's refusal to reopen the case precluded him from presenting exculpatory evidence, (2) his trial counsel rendered in-

effective assistance, (3) the trial court improperly admitted evidence concerning prior uncharged rapes, (4) the trial court improperly admitted testimony by a school psychologist, and (5) the cumulative effect of these errors deprived Grotto of a fair trial. In an opinion reported at 203 F.Supp.2d 142 (2002), the district court rejected all of Grotto's claims except the first.

As to the denial of leave to reopen, the district court found that the new testimony that Grotto sought to introduce after resting his case "would have been conclusive on a significant issue" because Rochelle "would ... have definitively testified that Grotto was not at the Noe townhouse." *Id.* at 151. The court concluded that the refusal to reopen the case could only have resulted from the trial judge's " 'myopic insistence upon expeditiousness,' " *id.* (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)), and constituted a substantial impairment to Grotto's defense, depriving him of due process, *see* 203 F.Supp.2d at 152.

The district court conditionally granted the writ, ordering the State to release Grotto unless it granted him a new trial within 90 days. Judgment was entered accordingly. This Court stayed the judgment pending resolution of this appeal.

## II. DISCUSSION

On appeal, the State contends that the district court erred in failing to conclude that it was within the discretion of the trial court to deny Grotto permission to reopen his case, and hence that that denial was neither contrary to nor an unreasonable application of clearly established federal law. Grotto urges us to uphold the granting of the writ either on the ground adopted by the district court or on the basis of any of the other claims asserted in his habeas petition. For the reasons that follow, we reverse the district court's ruling that Grotto was denied due process; we do not reach the alternative claims raised by Grotto because he did not obtain a certificate of appealability permitting him to seek review of the district court's rejection of those claims; and we decline to grant such a certificate.

### A. *The Denial of a Continuance and Leave To Reopen*

■■■ Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief may be granted, to the extent pertinent here, only if the state court's adjudication on the merits of a claim has resulted in a decision that is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2000). A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Overton v. Newton,* 295 F.3d 270, 275 (2d Cir.2002). A state court's decision involves an unreasonable application of Supreme Court precedent if it "identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. 1495; *see also Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 251, 154 L.Ed.2d 187 (2002).

■■■ It is, of course, well established as a fundamental matter of due process

that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt. *See, e.g., Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Nonetheless, the trial judge has considerable discretion in matters of scheduling, *see, e.g., Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *Ungar v. Sarafite,* 376 U.S. 575, 589–91, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), and in seeing that the trial is conducted in a fair, efficient, and orderly manner, *see, e.g., Taylor v. Illinois,* 484 U.S. at 414–15, 108 S.Ct. 646; *Noble v. Kelly,* 246 F.3d 93, 99 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001).

■■■ The State's appeal concerns the trial court's denial of a continuance to permit Grotto to call Rochelle as a witness and its denial of permission to reopen the evidence, even without a continuance, to call Planke as a witness. Neither denial was contrary to federal law.

The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler v. Fretag,* 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite,* 376 U.S. at 589, 84 S.Ct. 841. *See also Morris v. Slappy,* 461 U.S. at 11, 103 S.Ct. 1610 (denial of continuance did not violate the defendant's Sixth Amendment right to counsel: "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances . . . .").

In *Ungar,* the defendant was charged with criminal contempt and given five days' notice of the contempt hearing. He was granted two brief continuances in order to retain new counsel. A new attorney agreed to undertake the defense on the condition that he could obtain a one-week delay in order to familiarize himself with Ungar's case; but counsel's request for a continuance was denied, and counsel was allowed to withdraw. Ungar himself then requested an adjournment of just a few hours in order to gather exonerative medical evidence; that request too was denied. After being convicted of contempt, Ungar contended that his right to due process had been violated. The Supreme Court disagreed, noting, *inter alia,* that Ungar had presented "no reason why the testimony and medical proof, which he conceded were readily available and producible within hours, w[ere] not obtained" prior to the hearing. *Id.* at 591, 84 S.Ct. 841. It concluded that, "[g]iven the deference necessarily due a state trial judge in regard to the denial or granting of continuances, we cannot say these denials denied Ungar due process of law." *Id.*

■■■ In the present case, we cannot say that Appellate Division's affirmance of the

rulings of the state court constituted either a deviation from or an unreasonable application of the above principles. Grotto was not denied his right to present a defense. He called several witnesses to testify that he was not present at the townhouse on the day of the wedding. Grotto himself also so testified, and he denied all of the charges against him. He has not shown any respect in which he was denied a full and fair opportunity to call any witness or present any evidence he desired before he announced that he rested his case.

The trial court's denial of the request by Grotto, after he had rested, for a continuance in order to call Rochelle as a witness and present the two new prints was well within the scope of the court's broad discretion. First, in seeking a continuance to call Rochelle, Grotto's attorney did not represent that the handwriting on the prints was in fact that of Rochelle but only that he was advised that Grotto's "family" believed it was her handwriting. Nor did counsel indicate that he, or any member of the Grotto family, had attempted to contact Rochelle by telephone that morning to seek at least preliminary confirmation of that belief. Thus, counsel told the court he still needed to determine "whether or not" (Tr. 534; *see also id.* at 532–33) the writing was that of Rochelle.

Second, whether or not the comments on the backs of the prints were written by Rochelle, there was no indication that Rochelle would be able to testify that the pictures shown in the PX 11 negatives were not taken by Grotto. Rochelle herself could not have taken those four pictures; one was taken at the wedding ceremony, which she did not attend. Grotto's attorney said he hoped Rochelle's "testimony would be that ... it was Ralph who took all four of those photographs." (Tr. 535.) But Ralph himself had already testified that he did not know who took those

pictures. Indeed, before being shown PX 11, Ralph did not even recall that any pictures had been taken at the townhouse before the wedding ceremony. In the face of that testimony, we cannot agree with the view of the district court that Rochelle's testimony would "definitively" have shown that Grotto was not at the townhouse. And even if Rochelle would have testified that Grotto was not at the townhouse, as did Linda, Kenneth, Ralph, and Jean, no explanation was offered as to why Rochelle was not called as a witness to so testify before Grotto rested his case.

Finally, Grotto offered no excuse whatever for not having uncovered the two prints in time to have presented them before he rested his case. A year before the start of trial, the prosecution had asked Grotto to produce all pictures he had taken on August 22, 1992, in connection with Linda's wedding. And, as the trial court stated, the importance of the sequence of pictures shown by the negatives on PX 11 had been apparent "in this trial from virtually the first day." (Tr. 551.)

In sum, we see no abuse of discretion in the court's denial of Grotto's request for a continuance in order to call Rochelle as a witness, given (a) Grotto's lack of diligence in finding the prints, (b) the lack of certainty that Rochelle had written the comments on the backs of the prints, (c) the apparent lack of any attempt to ask Rochelle herself whether she had written the comments, (d) the attenuated relevance of Rochelle's having written those comments, and (e) the unlikelihood that Rochelle could credibly testify that Ralph took the four pictures on PX 11 when Ralph himself had testified that he did not know that any pictures had been taken that morning at the townhouse and did not know who took the three whose negatives were part of PX 11. Accordingly, the Appellate Division's

rejection of Grotto's challenge to the denial of a continuance was not a violation or misapplication of clearly established federal law.

Nor can we conclude that there was any violation or misapplication of clearly established federal law in the Appellate Division's rejection of the challenge to the trial court's refusal to permit Grotto to reopen the evidence, even without the need for a continuance, in order to introduce testimony from Planke. *Cf. United States v. Bayer*, 331 U.S. 532, 538–39, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947) (not reversible error for trial court to refuse to allow a defendant to introduce, after the start of jury deliberations, an unverified document whose importance should have been readily apparent before the defense rested, especially where no excuse was offered for the tardiness of the proffer).

Although the request to reopen Grotto's case to call Planke as a witness was made prior to jury deliberations, and indeed prior to counsel's summations, there was no error in the trial court's denial of the request. First, Grotto's attorney proffered no foundation to show that Planke's desired testimony would be admissible. He provided little information to show that Planke, whom he described generally as "a niece" of an unspecified member of the Grotto family, was familiar with Rochelle's handwriting; he stated merely that she had received a card from Rochelle and Ralph that the "family" believed had been written by Rochelle. More importantly, even if Planke could have testified that the card she received from Rochelle and Ralph bore the handwriting of Rochelle, no information was provided to show that Planke had expertise in handwriting analysis sufficient to warrant allowing her to testify that two or more documents had been written by the same person. In the absence of information indicating such exper-

tise, her testimony would likely have been inadmissible even if offered before Grotto rested, and its exclusion after Grotto rested cannot have been error. *See generally Bayer*, 331 U.S. at 538, 67 S.Ct. 1394 (not error to exclude belatedly offered evidence where, "[e]ven during the trial such an offer, with no foundation in testimony and against objection, would have been inadequate").

Moreover, even if Planke were sufficiently expert to testify as Grotto wished, her testimony could not establish that the prints on which Rochelle wrote notes were not made from film shot by Grotto. As the trial court found, the testimony proffered by Grotto after he rested was "hardly conclusive" on the question of Grotto's guilt or innocence. (Tr. 536.)

Finally, given the lack of foundation for and attenuated relevance of Planke's planned testimony, permitting Grotto to present that testimony after he had rested, and after the court had informed the jury that it had heard all of the evidence, could well have caused the jury to give Planke's testimony unwarranted weight.

In sum, this was not a case in which a defendant was prevented from presenting evidence in his own defense. Grotto had called witnesses and introduced exhibits. It was not until after he voluntarily rested his case that he asked the court to grant him a continuance and allow him to present additional evidence—evidence that he should have produced earlier, that he was not prepared to validate, and that had only a tenuous bearing on the question of his guilt or innocence. As the denial of Grotto's motions in these circumstances was within the trial court's discretion, we see no violation or misapplication of established federal law, and we thus conclude that the district court erred in granting his petition for habeas corpus on the ground

that the denial deprived him of due process.

## B. *Alternative Grounds for Affirmance*

Grotto's habeas petition also asserted claims of ineffective assistance of trial counsel and various evidentiary errors, claims that were rejected by the district court, and he invites us to affirm on the basis of any of those claims, singly or in combination. We decline that invitation because Grotto has neither obtained a certificate of appealability permitting review of his rejected claims nor made a showing that would entitle him to such a certificate.

Prior to AEDPA, a state prisoner who wished to obtain review of the denial of his petition for a writ of habeas corpus was required to obtain a "certificate of probable cause" allowing him to appeal. *See* 28 U.S.C. § 2253 (1994). This requirement was extended to the circumstance in which the state appealed from a decision granting the writ on specified grounds, and the petitioner sought to have the granting of the writ upheld on the basis of one or more of his rejected claims. *See Roman v. Abrams,* 790 F.2d 244, 244–45 (2d Cir. 1986) (per curiam). In ruling that even a victorious petitioner must obtain a certificate of probable cause in order to obtain review of his rejected claims, we noted that a certificate of probable cause may limit the scope of an appeal to one or more specified issues, *see id.* at 245; *Vicaretti v. Henderson,* 645 F.2d 100, 101–02 (2d Cir.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981), and that requiring a certificate of probable cause for review of rejected claims even where another claim has been upheld is prudentially sound because it "focuses the attention of litigants and the court on potentially meritorious issues, while avoiding the waste of judicial resources in a futile review of clearly mer-

itless claims," *Roman v. Abrams,* 790 F.2d at 245.

█ Under AEDPA, a losing habeas petitioner is required to obtain, instead of a certificate of probable cause, a certificate of appealability, *see* 28 U.S.C. § 2253(c) (2000); but the "requirement of a certificate of appealability . . . appears to make no significant change in the standard applicable to the former requirement of a certificate of probable cause," *Reyes v. Keane,* 90 F.3d 676, 680 (2d Cir.1996), *overruled on other grounds, Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and the goal of avoiding the waste of judicial energy on the consideration of clearly meritless claims is embodied in a new statutory provision. Under AEDPA, a certificate of appealability is not to be granted unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and "[t]he certificate of appealability . . . *shall indicate which specific issue or issues satisfy the showing required by paragraph (2),*" *id.* § 2253(c)(3) (emphasis added). Plainly, the AEDPA provision that the certificate of appealability "shall" specify the issue or issues as to which review is permitted evinces the same concern for conservation of judicial resources that led to our conclusion in *Roman v. Abrams* that a victorious habeas petitioner was not entitled to defend an appeal by the state on the basis of any rejected claim or claims unless he obtained permission to do so.

█ Accordingly, we conclude that a habeas petitioner to whom the writ has been granted on one or more grounds may not assert, in opposition to an appeal by the state, any ground that the district court has not adopted unless the petitioner · obtains a certificate of appealability permitting him to argue that ground. *Accord Fretwell v. Norris,* 133 F.3d 621, 623 (8th

Cir.) (dismissing petitioner's cross-appeal where certificate of appealability had been denied), *cert. denied,* 525 U.S. 846, 119 S.Ct. 115, 142 L.Ed.2d 92 (1998).

In the present case, Grotto has not obtained a certificate of appealability. And were we to treat his brief on appeal as a request for such a certificate, we would deny that request because in advancing his alternative grounds Grotto has not made a substantial showing of the denial of a constitutional right.

## CONCLUSION

We have considered all of Grotto's contentions that are properly before us in support of the granting of the writ. For the reasons discussed above, the judgment of the district court is reversed. The matter is remanded for entry of a judgment dismissing the petition.