Absalon VASQUEZ, Petitioner,

v.

Thomas POOLE, Superintendent, Five Points: Correctional Facility, & The Attorney General of the State of New York, Respondents.

No. 03–CV–4935(ERK)(MDG).

United States District Court,
E.D. New York.

Aug. 20, 2004.

Robert Alexander Osuna, New York City, for Plaintiff.

New York State Attorney Generals Office–Generic, Queens County District Attorneys Office–Generic, Emil Bricker, Kew Gardens, NY, for Defendants.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

Petitioner Absalon Vasquez seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 from his 1999 conviction for burglary in the first degree, attempted rape in the first degree, assault in the third degree, and endangering the welfare of a child. After a jury trial, petitioner was sentenced to concurrent indeterminate prison terms of ten to twenty years and five to ten years, and two separate concurrent prison terms of one year. The Appellate Division affirmed the conviction, *People v. Vasquez*, 297 A.D.2d 297, 745 N.Y.S.2d 920 (2d Dep't 2002), and petitioner's application for leave to appeal to the Court of Appeals was denied. *People v. Vasquez*, 98 N.Y.2d 732, 749 N.Y.S.2d 482, 779 N.E.2d 193 (2002).

While Mr. Vasquez raises four issues in his petition for habeas corpus, I focus primarily on his claim that the state court unreasonably applied Supreme Court law in affirming the trial court's decision to allow the victim to testify about her pretrial identification of Mr. Vasquez. The identification was a show-up at the police station. It took place one-and-a-half hours after the crime occurred when Mr. Vasquez freely entered the police station, asked for the police officer who had been investigating the case, and claimed to have dropped some papers that had been found at the scene of the crime. The identification was made under suggestive circumstances. It was nevertheless admissible. I write at some length not because the issue is a particularly close one, but because it raises an important question about how federal courts should review state court decisions regarding the admissibility of eyewitness identifications on habeas corpus.

### Background

In the middle of the day on August 15, 1997, petitioner assaulted and attempted to rape Aracelis Madera, a sixteen-year-old girl. Aracelis lived with her mother, sister, brother, and her mother's boyfriend, Shahzad Haq in the second and third floor of a two-family house in Queens, New York. Tr. 385–86. The door to the house was in the back atop an external stairway that led into a driveway and garage area. Tr. 387–88. Also in the back of the house was an unprotected window that looked from the living room onto the stairs. Tr. 389. Just before noon on August 15, 1997, Aracelis Madera left her house to use a payphone across the street. Tr. 387. After making a call, she walked back through the driveway and up the stairs, entered her apartment, and locked the door. Tr. 388–89. Leaving the window open, she then went upstairs to her third-floor bedroom. Her room had three large windows, making it "very light inside" at noon. Tr. 389–90. After spending several minutes in her room, Aracelis walked back toward the stairs to go to the bathroom. Tr. 390. Before she reached the bathroom, however, she saw a man she had never seen before—later identified as Mr. Vasquez— coming to the top of the stairs. *Id.*

Mr. Vasquez immediately grabbed Aracelis and put his hand over her mouth. Tr. 391. He told her to "shut up" and began forcing Aracelis backward until they were in her bedroom. Tr. 392–94, 458–59. During this time, Aracelis and Vasquez

"weren't really far apart from each other" and she was looking directly at his face. Tr. 392–93. After Vasquez pushed Aracelis into her bedroom, he pushed her onto the bed and got on top of her. Tr. 394. Aracelis described it as follows: "He was on top of me and he was kissing my neck and trying to pull down my shorts." *Id.* She thought he was going to rape her, and she struggled to pull him off of her. *Id.* The entire time, however, Vasquez kept one hand pushing down on Aracelis's mouth. *Id.* After a few minutes of struggling with Vasquez on top of her, Aracelis managed to lift his hand from her mouth so that she could scream. Tr. 395. When she screamed, Vasquez hit her in the mouth—cutting her mouth on the front and side against her metal braces. Tr. 395–96. After being hit, Aracelis managed to scream for a second time, but then Vasquez re-covered her mouth. Tr. 396.

When Aracelis screamed the second time, she heard the door to her mother's bedroom open. Tr. 397. Her mother's boyfriend, Shahzad Haq, had been sleeping in the bedroom and had heard the screams. Tr. 770. When the door opened, Vasquez jumped off of Aracelis and ran down the stairs. Tr. 397. Haq saw his face as he turned to go down the stairs. Tr. 772. Haq then ran down the stairs after Vasquez (who fled through the window) and Aracelis herself ran outside and across the street to the payphone to call 911. Tr. 399–401, 463–66; 775. Meanwhile, she could see Haq chasing Vasquez toward Northern Boulevard. Tr. 400.

Aracelis was crying as she telephoned the police, but managed to describe what had happened to the 911 operator. Tr. 401. A few minutes later, at approximately 12:06 p.m., a police car appeared on the scene with two female officers, Lorie Robinson and Ivette Torres. Tr. 308, 401–02, 584. When the officers found her, Aracelis was hysterical and bleeding from the mouth. Tr. 549. After explaining what had happened, she went with the officers to search for Haq and Vasquez. Tr. 308–09, 402. They found Haq, but despite patrolling the area for somewhere between ten and thirty minutes, they were unable to find Vasquez. Tr. 336, 402–03; 640. Eventually, Aracelis, Haq, and the police officers returned to Aracelis's home. Tr. 403.

When arrived back at the house, Haq told the officers that Vasquez had dropped some papers while he was running through the driveway. Tr. 780. He pointed out the papers, which were folded and lying on the ground. Tr. 310, 551, 579. Specifically, they were on the house side of an open gate that separated the driveway from the street, some distance back from the sidewalk. Tr. 352–54, 405. One of the police officers picked them up. Tr. 406, 553. The papers were an employment application filled out by Vasquez that stated his name, address, and telephone number.

After spending approximately ten minutes in Aracelis's apartment, the officers, along with Aracelis and Haq, went to the address listed on the job application. Tr. 315. When they arrived, Officers Robinson and Torres went upstairs to the listed apartment while Haq and Aracelis waited in the car. Tr. 316, 581. At the apartment, the officers had a conversation with Vasquez's wife, Lucy Vergara, whose name had been provided as a contact on Vasquez's employment application. Tr. 317, 581. No one else appeared to be present, but Ms. Vergara provided the officers with a photograph of Vasquez. Officer Robinson left her name and the address of the precinct with Ms. Vergara, and then, at approximately 1:20 p.m., the officers returned to the precinct with Haq and Aracelis. Tr. 317–18, 582, 586, 692.

When she was at the precinct, Aracelis first went upstairs and spoke to Detective

Falciano. Tr. 414. She gave the detective a description of the man who had attacked her and then began to look at three different books of photographs in an effort to identify the individual. Tr. 414, 513. She was unable to identify anyone from the pictures. Tr. 415. Meanwhile, at approximately 1:40 p.m., twenty minutes after Officers Robinson and Torres had returned to the precinct with Haq and Aracelis, Absalon Vasquez had walked into the precinct with Ms. Vergara. Tr. 586. They asked for Officer Robinson. Tr. 587. When Officer Robinson introduced herself, Vasquez stated that "he was looking for some papers that he had dropped when he was chasing someone." Tr. 588. Officer Robinson then walked Vasquez upstairs and led him to a small room. Tr. 415. At Officer Robinson's direction, Aracelis looked into the small room where Vasquez was standing alone. *Id.* She immediately recognized him as the man who had attacked her. Tr. 517. Vasquez had changed his clothes, but she recognized him nevertheless. *Id.*

At 1:59 p.m., after Aracelis had identified Vasquez as the perpetrator, Officer Robinson placed Vasquez under arrest. Tr. 591. She also had a conversation with Ms. Vergara. Tr. 593. Pursuant to that conversation, Officer Robinson asked Officer Torres to return with Ms. Vergara to her apartment and "retrieve the shirt that the defendant was wearing that morning." Tr. 594. Officer Torres returned with Ms. Vergara to Vasquez's home, where Ms. Vergara handed her a beige shirt. Tr. 320. At trial, both Haq and Aracelis would testify that the shirt looked like the one they had seen Vasquez wearing during the attack. Tr. 415–17, 773–74.

Petitioner was ultimately indicted for Burglary in the First Degree (New York Penal Law § 140.30[2] ), Burglary in the Second Degree (New York Penal Law § 140.24[2] ), Attempted Rape in the First Degree (New York Penal Law §§ 110/130.35[1] ), Assault in the Third Degree (New York Penal Law § 120.00[1] ), and Endangering the Welfare of a Child (New York Penal Law § 260.10[1] ). After two mistrials—one for the admission of unduly prejudicial testimony and one for a hung jury—petitioner was convicted on all counts. A judgment was entered on March 26, 1999 and petitioner was sentenced to concurrent prison terms of ten to twenty years for the first-degree burglary conviction, five to ten years for the first-degree rape and second-degree burglary convictions, and one year each for his third-degree assault and endangering the welfare of a child convictions. On August 5, 2002, the Appellate Division modified petitioner's conviction by dismissing the second-degree burglary conviction as a lesser-included offense of the first-degree burglary conviction. *See People v. Vasquez*, 297 A.D.2d 297, 298, 745 N.Y.S.2d 920 (2d Dep't 2002). Otherwise, it affirmed the conviction.

### Discussion

Petitioner makes four arguments in his *pro se* petition for habeas corpus, all raised in his brief to the state appellate division.

### I. Whether the admission of the victim's pre-trial identification warrants habeas relief

█ Petitioner argues that his conviction should be overturned because the trial judge denied his motion to suppress Aracelis Madera's pre-trial identification, which he characterizes as a "suggestive police showup in the precinct." *See* Petition for habeas corpus, at 5. He claims that this violated his constitutional right to due process. Petitioner raised this argument with the Appellate Division, which found it "without merit." *People v. Vasquez*, 297 A.D.2d 297, 298, 745 N.Y.S.2d 920 (2d Dep't 2002) (stating that petitioner's "re-

maining contentions, including those raised in his supplemental pro se brief, are without merit"). While the Appellate Division did not explain its reasoning, "a state court decision need not mention a particular argument or explain the reasons for rejecting it" for that decision to be considered "on the merits." *See Dallio v. Spitzer,* 343 F.3d 553, 560 (2d Cir.2003). Indeed, the Second Circuit explained recently that, it will presume a "claim was adjudicated on the merits where it was one of the remaining contentions that the Appellate Division stated were 'without merit.'" *Francolino v. Kuhlman,* 365 F.3d 137, 141 (2d Cir. 2004) (citing *Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir.2002)). Therefore, in a situation such as this, "we review petitioner's due process claim under the standard prescribed by AEDPA, rather than de novo." *Id.; see* 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996).

Under AEDPA, habeas review is available only when a state court judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Importantly, "clearly established Federal law, as determined by the Supreme Court," means "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct gov-

erning legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

█ Here, there was clearly established federal law at issue when petitioner's state court conviction became final. As part of his right to due process, a criminal defendant has the right not to be subjected to suggestive police identification procedures that create a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). This does not mean that all suggestive identification procedures raise a constitutional issue. First, the challenged procedure must be "unnecessarily suggestive." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Second, it must lead to such inherent unreliability that it is inappropriate for a jury to determine the weight to give the evidence; unnecessary suggestiveness in and of itself does not violate due process. *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Thus, the "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199, 93 S.Ct. 375. This reflects the fact that, "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Id.* at 198, 93 S.Ct. 375 (internal quotations omitted); *see also Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243 ("We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony").

There was also relevant federal law that was unclear at the time petitioner's state court conviction became final. In *Neil v. Biggers* and *Manson v. Brathwaite,* the

Supreme Court set forth a list of five factors for lower federal courts to balance against suggestiveness when deciding whether a pre-trial identification, in addition to being "unnecessarily suggestive," creates a "very substantial likelihood of irreparable misidentification." Specifically, Justice Blackmun wrote in *Brathwaite:*

> The factors to be considered are set out in *Biggers.* These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243. The lack of clarity arose with Justice Blackmun's use of the word "include," a word that suggests that other factors could also be considered. In *Biggers,* Justice Powell had also used the word "include" when describing the five factors. 409 U.S. at 199, 93 S.Ct. 375. In neither case, however, did the Court describe what other factors could be a part of the balancing test.

Recently, in *Abdur–Raheem v. Kelly,* 98 F.Supp.2d 295 (E.D.N.Y.2000), I wrote an extensive opinion urging that there should be a "sixth factor" in a trial court's analysis of whether a pre-trial identification that was unnecessarily suggestive should nevertheless be deemed admissible because it did not create a "very substantial likelihood of misidentification." I wrote:

> The factors set out in *Brathwaite* . . . do not exhaust the possible ways in which identification evidence may prove to be reliable or unreliable. Indeed, the Supreme Court was careful to say that the factors to be considered "include" the ones named. *Brathwaite,* 432 U.S. at

114, 97 S.Ct. at 2253. In my view, another critical factor should be taken into account before an otherwise unassailable jury verdict is set aside in a collateral proceeding: the evidence or lack of evidence that the petitioner is guilty of the crime of which he has been convicted. This sixth factor goes to the heart of the Supreme Court cases that initially addressed the problem posed by eyewitness identifications. Those cases developed out of concerns that eyewitness identifications (by strangers) are not reliable, that juries could not be trusted to evaluate the deficiencies of such apparently compelling evidence, and that the admission of suggestive identifications risked the ultimate injustice—the conviction of an innocent person. In short, the reason the Court involved itself in the first place with suggestively obtained identifications was the recognition that they were a "major factor contributing to the high incidence of miscarriage of justice." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967), *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967) ("A conviction which rests on a mistaken identification is a gross miscarriage of justice.").

*Abdur–Raheem,* 98 F.Supp.2d at 305. I explained that with corroboration as a sixth factor, courts would be more likely to ascertain which identifications are genuinely reliable and which are unreliable:

> The corroboration rule I suggest here for eyewitness identification testimony would not preclude a conviction based on uncorroborated eyewitness testimony. Instead, it would only bar the admission of uncorroborated identification testimony when the totality of circumstances indicated that there was a significant risk of misidentification. Where corroboration was present, the jury would be

permitted to determine the weight to be accorded to an otherwise questionable identification that had been suggestively obtained. Such a rule shows appropriate deference to the judicial process of the states, and to the central role of the jury as the finder of fact. It is also consistent with the current practice of many courts, although that practice has not yet achieved recognition as a sixth factor in the admissibility analysis of identification evidence.

Most important, the proposed rule provides greater insurance against the conviction of an innocent person than a test that focuses exclusively on the Biggers–Brathwaite factors, which has been almost universally criticized as inadequate. *See* Charles A. Pulaski, "*Neil v. Biggers:* The Supreme Court Dismantles the Wade Trilogy's Due Process Protection," 26 Stan. L.Rev. 1097 (1974) (suggesting that the *Biggers* test is so easily satisfied that the due process protection it provides is probably no greater than what already existed before *Stovall* ).

*Id.* at 306.

In addition to being consistent with *Brathwaite's* Broader statement that, "[t]he 'central question' ... was 'whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive," 432 U.S. at 106, 97 S.Ct. 2243 (quoting *Biggers,* 409 U.S. at 199, 93 S.Ct. 375), this "sixth factor" rule had explicit support in federal case law. First, the sixth factor rule was suggested in a concurring opinion by Judge Leventhal for the Court of Appeals for the D.C. Circuit that Justice Blackmun cited approvingly in *Brathwaite.* Justice Blackmun wrote that, "Judge Leventhal, although speaking pre-*Biggers* and of a pre-*Wade* situation, correctly has described *Stovall* as protecting an evidentiary interest." *Brathwaite,* 432 U.S. at 113, 97 S.Ct. 2243 (citing *Clemons v. United*

*States,* 408 F.2d 1230, 1251 (D.C.Cir.1968) (Leventhal, J. concurring)). Judge Leventhal had explained that, because of the nature of the due process rights surrounding identifications, it is

appropriate—particularly in cases where the trial as well as the identification preceded *Wade, Gilbert* and *Stovall*— that the court assess not only the 'totality of circumstances' surrounding the challenged identification, but also the totality of circumstances at trial concerning the issue of identification, i.e. the totality of proof and other factors bearing on the likelihood of misidentification. The mere fact that some 'unreliable' identification testimony was received does not establish a denial of the due process right to a fair trial. . . .

The soundness of making a due process right depend on a review of evidence becomes clear when one focuses on the interests protected retroactively by the *Simmons–Stovall* due process right. Unlike the interests preserved by the guarantee of counsel or some of the other specific guarantees, the interests guarded by *Stovall* cannot so easily be factored out and assessed independently of the evidence.

*Clemons,* 408 F.2d at 1251(internal footnote omitted). Although Justice Blackmun did not quote the entirety of this last passage, his recognition that Judge Leventhal correctly described the due process right sheds light on its proper interpretation.

Judge Leventhal's concurrence in *Clemons* preceded *Brathwaite,* but his argument that the totality of the circumstances should include a consideration of all the evidence has found support in cases after *Brathwaite* as well. A First Circuit case authored by then-Judge Breyer relied in part on corroborative evidence of guilt in holding that an eyewitness identification

was properly admitted. *See United States v. Lau,* 828 F.2d 871, 875 (1st Cir.1987). And in evaluating the reliability of eyewitness identifications in a drive-by shooting, the Seventh Circuit explained that "[c]orroborated eyewitness testimony is much less suspect than one individual's visual impression." *United States ex rel. Kosik v. Napoli,* 814 F.2d 1151, 1156 (7th Cir. 1987). Thus, the Seventh Circuit considered corroborating evidence, as well as the *Biggers/Brathwaite* factors in admitting a suggestive identification. *Id.* Even the Second Circuit had suggested that considering corroboration evidence may be appropriate. *See Gonzalez v. Hammock,* 639 F.2d 844, 848 (1980) (examining corroborating evidence after analyzing the five *Biggers/Brathwaite* factors by writing: "Finally, as the Supreme Court has done, we must acknowledge other aspects of this case which, although peripheral, certainly do not detract from our decision."); *see also United States v. Rogers,* 73 F.3d 774, 778 (8th Cir.1996) (considering corroboration evidence because "additional testimony diminishes any likelihood of irreparable misidentification"); *United States v. Wilkerson,* 84 F.3d 692, 695 (4th Cir.1996), *cert. denied,* 522 U.S. 934, 118 S.Ct. 341, 139 L.Ed.2d 264 (1997) ("Courts may also consider other evidence of the defendant's guilt when assessing the reliability of the in-court identification."). In short, there was specific precedential support to go along with the policy arguments in favor of employing a "sixth factor" in determining the reliability of a suggestive identification.

In the case of *Abdur–Raheem,* the "sixth factor" proved significant. The petitioner was convicted in New York state court of murdering Charles Hill during an argument at a bar. He had shot Mr. Hill in the head, the same method he employed to murder three other people in the course of twenty days. 98 F.Supp.2d at 297. Mr. Abdur–Raheem confessed to the crime under circumstances that were permissible under the Constitution; but because of a law peculiar to New York jurisprudence—which prevents the police from obtaining a confession from an individual represented by counsel on a separate crime—the confession was suppressed at trial. *Id.* (citing *People v. Whitaker,* 75 A.D.2d 111, 114, 428 N.Y.S.2d 691, 692–93 (1980); *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Without use of Mr. Abdur–Raheem's voluntary confession, the state's principal evidence was identification evidence.

Two eyewitnesses had been present at the bar where Abdur–Raheem murdered Mr. Hill. They each had pre-trial identifications admitted at trial, both of which took place at a lineup that was inadvertently suggestive. The police had prepared the lineup thinking that an individual other than Mr. Abdur–Raheem was the shooter and using Mr. Abdur–Raheem as a filler. Nevertheless, petitioner was the only person in the line-up wearing a three-quarter length black leather coat (his own coat), which both witnesses testified was a distinctive feature of the person they had seen shoot Mr. Hill.

In my memorandum and order, I concluded that the accidental circumstance in Abdur-Raheem's case had led to a lineup that was extremely suggestive. More importantly, it had led to identifications that could not be deemed reliable through the traditional five *Biggers/Brathwaite* factors. I explained:

> [I]t appears that the witnesses had an opportunity to view the robbers for some minutes before the crime, and were somewhat attentive to them, at least initially. The witnesses had been drinking, however, and were distracted by the football game they were watching and their conversation with each other. Once the shooting took place, they had little opportunity to see the shooter's

face and were immediately or quickly distracted by the second gunman. There is no evidence one way or the other regarding the accuracy of their subsequent descriptions of the shooter, and the time between the shooting and the confrontation was not long or short enough to be a significant factor. Finally, and most important, one of the witnesses was so uncertain at the confrontation that he initially declined to make an identification and only did so after he learned that another person had picked someone out of the lineup as the shooter. Considering these factors alone, the identifications simply do not appear solid enough to outweigh "the corrupting effect of the suggestive identification itself," *Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253, especially given that both witnesses acknowledged that the suggestive coat was a factor in their identifications.

*Abdur–Raheem*, 98 F.Supp.2d at 304–05. Because the identifications were corroborated by Mr. Abdur–Raheem's confession, his wearing the three-quarter length black leather coat that the witnesses had remembered, and his propensity to kill people in precisely the manner Mr. Hill had been murdered, however, I held that the trial court did not err in admitting them. *Id.* at 316. In other words, I found that if the inquiry were limited to the five *Biggers/Brathwaite* factors, the identifications would be inadmissible, but if the inquiry genuinely considered the totality of the circumstances, the identifications would be admissible.

Without addressing the bulk of my analysis, Second Circuit rejected my holding in *Abdur–Raheem*, which it "believe[d] confuse[d] the due process inquiry with harmless-error analysis." *Raheem v. Kelly*, 257 F.3d 122, 140 (2d Cir.2001). Specifically, it concluded that, "evidence of record that is unrelated to an identification but that is supportive of a finding of guilt is properly considered in harmless-error analysis, not in the due process inquiry of whether the identification has reliability." *Id.* at 141. Judge Kearse explained:

> We read *Manson v. Brathwaite* as consistent with our view. In that case, the Supreme Court applied the *Neil v. Biggers* factors in determining that the identification at issue was reliable, and it then referred to trial evidence that was corroborative of guilt, noting, for example, the frequent presence of the defendant at the site of the illegal activity; but the Court stated that that evidence "plays no part in our analysis" of the identification's reliability. *Manson v. Brathwaite*, 432 U.S. at 116, 97 S.Ct. 2243, 53 L.Ed.2d 140. That observation in the majority opinion was further emphasized in Justice Stevens's concurrence:

>> [I]n evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side.... Mr. Justice Blackmun's opinion for the Court carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself.

> *Id.* at 118, 97 S.Ct. 2243, 53 L.Ed.2d 140 (Stevens, J., concurring).

*Raheem v. Kelly*, 257 F.3d at 140. Again, because of the legal peculiarity that had prevented the jury from hearing Mr. Abdur–Raheem's confession despite the fact that it was voluntary, the identification testimony had been critical to the prosecution's case. The Second Circuit therefore found that the state court's decision to admit the identifications had been reversible error, not harmless error.

The statements on which the Second Circuit relied in *Raheem v. Kelly*—Justice Blackmun's statement in *Brathwaite* that corroborative evidence "plays no part in

our analysis," and Justice Steven's statement in his concurrence where he commended Justice Blackmun—were not clear holdings of the Supreme Court. Indeed, because of the passing nature of each statement, it is unclear what either Justice meant. I explained this problem in *Abdur–Raheem.*

> Some explanation for the puzzling manner in which Justice Blackmun dealt with the issue of corroboration may be found in Judge Friendly's opinion for the Second Circuit in *Brathwaite,* which was reversed by the Supreme Court. Judge Friendly took a different view of the reliability of the eyewitness identification when weighed against the five *Biggers–Brathwaite* factors. At the time of *Brathwaite,* however, it was the clear rule in the Second Circuit that independent evidence corroborating an identification could provide the basis for admitting an otherwise questionable identification. *United States v. Reid,* 517 F.2d 953, 967 (2d Cir.1975). Such evidence was present in *Brathwaite,* corroborating the blatantly suggestive eyewitness identification: An undercover police officer had purchased drugs from *Brathwaite* at an apartment, and there was other evidence linking the defendant to that same apartment. Judge Friendly, concluded, however, that this evidence was not strong enough to sustain the admissibility of the eyewitness identification. As he explained,

>> Perhaps the strongest bit of evidence to strengthen the identification was *Brathwaite's* arrest in the very apartment where the sale was made. But *Brathwaite* offered an explanation of this which was not implausible, although evidently not credited by the jury. . . .

> *Brathwaite v. Manson,* 527 F.2d 363, 372 (2d Cir.1975). These circumstances may explain Justice Blackmun's unwillingness to rely on the corroborating evidence other than to say, quite consistently with Judge Friendly's analysis, that it did not undermine the reliability of the identification in this case, although it did not enhance it.

*Abdur–Raheem,* 98 F.Supp.2d at 307–08. As for Justice Stevens's comment, I wrote:

> While the Stevens opinion clearly says what Justice Blackmun avoided saying, it fails to set out the reasons for the rule it advocates, and seems somewhat inconsistent with the view expressed earlier in the concurrence. There, Justice Stevens suggested that "the Federal constitution does not foreclose experimentation by the States in the development of . . . rules" to "minimize the danger of convicting the innocent on the basis of unreliable eyewitness testimony." *Brathwaite,* 432 U.S. at 117–18, 97 S.Ct. at 2254–55 (Stevens, J., concurring). Surely, such experimentation could encompass a rule making the admissibility of questionable eyewitness identifications turn on corroborative evidence that suggests that the eyewitness identification is not mistaken and that the defendant is not innocent. Since the Supreme Court applies such a rule of corroboration to the admissibility of confessions— and for reasons similar to its concern about the reliability of eyewitness identifications—it seems improbable that the Court would disapprove such a rule for determining the admissibility of identification evidence.

*Id.* at 308.

Ultimately, all of this was speculation. "What is clear, however, is that the majority of the Supreme Court in *Brathwaite* did not expressly hold that the presence of corroboration could not be considered." *Id.* Indeed, this is why there is a circuit split on this score. *See Raheem v. Kelly,* 257 F.3d at 141 (stating that, "to the extent that some of our Sister Circuits have

indicated that their assessment of an identification's reliability (as distinct from their harmless-error analysis) may include consideration of unrelated evidence corroborating the defendant's guilt, we disagree") (citations omitted).

■] For a district court in the Second Circuit deciding the admissibility of a pretrial identification in the first instance, the Second Circuit's decision in *Raheem v. Kelly*—that under *Biggers* and *Brathwaite* only the listed five factors should be considered in determining the admissibility of an unnecessarily suggestive identification—is now the law and it must be followed. Nevertheless, as another panel of the Second Circuit would subsequently recognize, *see Kennaugh v. Miller,* 289 F.3d 36, 47–48 (2d Cir.2002), the panel in *Raheem v. Kelly* did not hold that this was the only objectively reasonable interpretation of *Biggers* and *Brathwaite*. Nor did it conclude that this was a clear holding of the Supreme Court. Indeed, although the case involved a petition for habeas corpus, the panel in *Raheem v. Kelly* did not even mention the standard of review prescribed by AEDPA. Thus, *Kennaugh v. Miller,* 289 F.3d 36 (2d Cir.2002), concluded, *Raheem v. Kelly* can only be read as "reject[ing] this 'sixth factor' approach as a matter of federal law in this circuit," rather than holding that the inclusion of a "sixth factor" would be "contrary to" the clear holdings of *Biggers* and *Brathwaite,* or an unreasonable application of those holdings. 289 F.3d at 47–48.

In *Kennaugh,* 289 F.3d 36, the Second Circuit was reviewing another habeas decision in which I had determined that corroboration evidence was an appropriate factor to consider in deciding whether an identification is sufficiently reliable to be admitted over a due process objection. *Id.* (affirming *Kennaugh v. Miller,* 150 F.Supp.2d 421 (E.D.N.Y.2001)). I had decided *Kennaugh v. Miller* after my deci-

sion in *Abdur–Raheem v. Kelly* but before the Second Circuit's decision reviewing it. Thus, the Second Circuit's decision in *Kennaugh v. Miller* closely followed its decision in *Raheem v. Kelly*. The state court had admitted an in-court identification even though the witness had previously been unable to identify the defendant in a non-suggestive lineup. This was not contrary to clearly established federal law as determined by the Supreme Court—the Supreme Court had never held that "a witness, who failed to identify the defendant at a pretrial lineup at which he was represented by counsel, is precluded from making an in-court identification merely because the circumstances there are inherently suggestive." *Kennaugh,* 150 F.Supp.2d at 432. But it may have been an unreasonable application of the Supreme Court's "general principle that, while the reliability of eyewitness identification testimony is usually an issue for jury determination, when the degree of unreliability leads to 'a very substantial likelihood of irreparable misidentification, the tainted testimony must be excluded to preserve the defendant's due process rights." *Kennaugh,* 289 F.3d at 43 (quoting *Brathwaite,* 432 U.S. at 116, 97 S.Ct. 2243); *see Yarborough v. Alvarado,* —— U.S. ——, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (recognizing that the refusal to extend a general principle can be an unreasonable application of clearly established federal law because "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.").

I ruled that the admission of the in-court identification was reasonable. Again, using only the five factors of *Biggers* and *Brathwaite,* the identification would not have been sufficiently reliable to outweigh the suggestive nature in which it was made. Nevertheless, there was sufficient

corroboration evidence (namely, the existence of petitioner's fingerprint in a critical location at the scene of the crime and a separate witness placing petitioner at the scene) to conclude that "no substantial likelihood of irreparable misidentification" existed. *Brathwaite,* 432 U.S. at 116, 97 S.Ct. 2243. For my determination, I did not rely on the reasoning of *Abdur-Raheem v. Kelly* (which had yet to be considered by the Second Circuit); I relied on the Second Circuit case of *Sims v. Sullivan,* 867 F.2d 142 (2d Cir.1989). In *Sims,* the Second Circuit had held that, regardless of the rule of pre-trial identifications, "a federal court is 'not bound in a collateral attack upon a state court conviction to view an in-court identification in isolation from the rest of the evidence.'" *Kennaugh,* 150 F.Supp.2d at 436 (quoting *Sims,* 867 F.2d at 146).

The Second Circuit affirmed my decision in *Kennaugh.* Judge Calabresi first agreed that, because of the absence of a clear Supreme Court holding, "the *particular* test established in *Biggers* was not mandated in cases, like the one before us, that do not involve a challenged pretrial identification." 289 F.3d at 46. He then agreed that the general due process principles of *Brathwaite* still applied. Of particular relevance here, Judge Calabresi concluded by explaining what this meant for a court reviewing convictions on habeas corpus:

> To say that the general due process standard established in *Manson [v. Brathwaite]* must be applied to the identification testimony in cases like the one before us still leaves state courts, in a habeas context, free to adopt any number of non-*Biggers* procedures designed to ensure the reliability of such testimony. One example of such alternative methods will suffice. Some courts have relied upon the test applied by the lower court in this case, which considered a sixth factor in the *Biggers* analysis and

looked to whether sufficient independent evidence of the defendant's guilt existed to support the reliability of the identification. Although we have recently rejected this "sixth factor" approach as a matter of federal law in this circuit, choosing instead a harmless error approach, *Raheem v. Kelly,* 257 F.3d 122, 140 (2d Cir.2001), it seems likely that under the AEDPA, a state court that used a "sixth factor" analysis would be applying the *Manson* requirements in a perfectly reasonable way.

*Kennaugh,* 289 F.3d at 47–48.

While *Kennaugh* involved the admissibility of an in-court identification as opposed to a pretrial identification, the court's reasoning extends to both. Judge Calabresi recognized that, although "federal law in this circuit" dictates that only the five *Biggers* factors be used in applying the *Manson v. Brathwaite* due process test, "it seems likely that under the AEDPA, a state court that used a 'sixth factor' analysis would be applying the *Manson* requirements in a perfectly reasonable way." *Id.* His comment was not contrary to the Second Circuit's decision in *Raheem v. Kelly,* where the panel never specifically considered the deferential standard of review owed to state court decisions under AEDPA. Again, in *Raheem v. Kelly,* Judge Kearse wrote that a "sixth factor" test was incorrect—not that it was objectively unreasonable. But "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor,* 529 U.S. at 410, 120 S.Ct. 1495. Judge Calabresi properly placed the significance Congress intended on the requirement that there be *clearly established federal law* and deference to the state courts' *reasonable application* of such law. Thus, as I turn to review the state court's decision in this case, I consid-

er Judge Calabresi's statement to be both correct, and the governing law on this score.

■] Because the Appellate Division in this case rejected petitioner's identification claim by stating that "defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit," *People v. Vasquez*, 297 A.D.2d at 298, 745 N.Y.S.2d 920, I do not know precisely how the state court came to its decision. But if the record contains any basis for rejecting a challenge to the validity of a judgment of conviction, I can rely on it even if it was not relied on by the state courts. *See Pinkney v. Keane*, 920 F.2d 1090 (2d Cir.1990) (affirming district court denial of habeas corpus relief, 737 F.Supp. 187 (E.D.N.Y.1990), where the district court denied the writ on grounds rejected by the state courts). Indeed, I must look at the record to see whether *any* objectively reasonable application of Supreme Court law could support the Appellate Division's decision to affirm the trial court's admission of Aracelis's pretrial identification. *See Williams v. Taylor*, 529 U.S. at 409–10, 120 S.Ct. 1495 (stating that "a federal habeas court making the 'unreasonable application' inquiry should ask whether a state court's application of clearly established federal law was objectively unreasonable."). Because a six factor test would be an objectively reasonable application of Supreme Court law, even if not a correct application of Second Circuit law, I consider both the five factor and six factor tests to see whether the state court's determination could be supported under either. If so, it would not constitute an error that warrants habeas corpus relief under AEDPA.

■ The first question, under either test for admissibility, is whether Aracelis Madera's pre-trial identification of Vasquez was suggestive. It was. While at the police precinct describing her assault,

detectives asked Aracelis to walk over to a window where she could look into a small room. In the small room, Vasquez was standing alone. Although he was not in handcuffs and had changed his clothes since the time of the assault, the implication was clear: The police thought this was the man who had attacked Aracelis. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *but see Biggers*, 409 U.S. at 198, 93 S.Ct. 375 ("the admission of evidence of a showup without more does not violate due process.").

Moreover, the identification was arguably unnecessarily suggestive. The district attorney contends that the decision to perform a showup Vasquez was appropriate because "to have held a lineup in petitioner's case would have meant the detention of an un-arrested man for several hours." Affidavit and Memorandum of Law in Opposition, at 28 (hereafter "D.A. Brief"); *see e.g. Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (noting that suggestive identifications may not be unduly suggestive when they happen immediately following a crime because they can "spar[e] innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them"); *United States v. Bautista*, 23 F.3d 726, 730 (2d Cir.1994) (finding the presentation of suspects to an informant directly after incident at the scene of the crime was not unnecessarily suggestive because it served a valid police function—avoiding the arrest of an innocent man). There is certainly support for this claim, particularly when combined with the fact that "a fresh identification is the best kind." Stephen A. Saltzburg, American Criminal Procedure, 595 (3d ed.1988). But, on the other hand, a few hours of detention would

not have been such a burden to petitioner, particularly when he was already present in the precinct and faced the alternative of a suggestive showup identification. And it is not clear how much a few extra hours would have affected the victim's memory. In any event, the "totality of the circumstances" are such that in spite of any suggestiveness, Aracelis Madera's pretrial identification was sufficiently reliable to let a jury consider it.

### 1. Opportunity to View

■ Aracelis Madera had considerable opportunity to view Vasquez during the crime. From the moment Vasquez grabbed her and started pushing her into her room and then onto her bed, she was facing him. Tr. 392–97. They "weren't really far apart from each other" and Aracelis was looking at directly his face. Tr. 392–93. This continued once Vasquez got her onto the bed and was on top of her, kissing her neck and face while holding her down. Indeed, Aracelis testified that throughout the several minutes of the encounter, she was looking at his face. Tr. 392–97.

It is also significant that the assault occurred during the middle of the day, when there was plenty of light. In Aracelis's bedroom, there were three windows, and the bed was directly below one of the windows. Tr. 394. Further, there was no evidence suggesting any impairment or any other fact that would have prevented Aracelis from seeing clearly on that day.

### 2. Degree of Attention

During the assault, Aracelis's attention was naturally focused on her attacker. Her ability to focus may have been adversely affected by the fact that she was terrified, see Tr. 397, but that same fact may have served to sharpen her attention. After all, she testified that throughout the attack, she was focused on Vasquez's face. Tr. 392–97.

Notably, this was not an incident where there was anything to draw the witness's attention away from her attacker. There was no testimony suggesting that Aracelis was in a diminished capacity in any way; nor was there any suggestion (as there is in many witness identification cases) that she would have been focused on a weapon instead of the perpetrator himself.

### 3. Accuracy of prior description

At his trial, petitioner sought to discredit Aracelis's pre-trial identification by pointing out inconsistencies with earlier descriptions she had made. Because the identification ultimately occurred only one-and-a-half hours after the incident, the only relevant prior descriptions were made when Aracelis telephoned 911 and in initial discussions with the police.

While the transcript of the 911 call is not a part of the record, its contents can be inferred from questions that were asked and answers that were given. See Transcript of trial, dated June 2, 1998, at 5. In her 911 call, Aracelis had apparently stated that the man who attacked her had been wearing a beige t-shirt and that he could have been wearing black boots. Id. at 7–8. She also had claimed he had a mustache like goatee. Id. at 7; Tr. 475. On the telephone, Aracelis did not describe the perpetrator's height and weight; nor did she describe his complexion beyond saying that he was Hispanic. Id. at 9. At trial, defense counsel seized on the alleged discrepancies between Aracelis's description in the 911 tape and in the ultimate identification—petitioner had a mustache, rather than a goatee, at the time of the incident, and the statement that the perpetrator was wearing a beige t-shirt was at odds with later statements that he was wearing a beige collared shirt.

Defense counsel also pressed the police officers regarding the fact that Aracelis

had not otherwise provided a detailed physical description of her attacker before the pre-trial identification. At the *Huntley/Wade* hearing, Officer Robinson testified that Aracelis stated that the man was a male Hispanic wearing jeans and a beige button front shirt. H/W Tr. at 22. She also testified that Aracelis had stated that she had gotten a good look at him. *Id.* at 24. But Officer Robinson was not able to give a detailed response as to what description Aracelis had provided.

The minor discrepancies and the failure to provide a more complete description can be explained by the fact that Aracelis was hysterical at the time she placed the 911 call and the fact that little time had passed in which to provide a complete description of her attacker. *See Gonzalez v. Hammock*, 639 F.2d 844, 847–48 (2d Cir.1980) (discounting the incomplete nature of prior descriptions by the fact that so little time passed before the ultimate identification). Also, the descriptions she gave were roughly consistent with the ultimate identification. On balance, her prior descriptions do not significantly bolster or detract from her pre-trial identification.

### 4. Level of Certainty

There is little evidence in the record concerning the victim's level of certainty at the time of her pre-trial identification, but what evidence exists suggests a high degree of certainty. At trial, she testified that she when she looked into the room, she recognized him by his face. Tr. 415. And when asked on cross-examination whether, "[t]o the exclusion of everybody else in the world you knew that was him?", she responded "yes." There is no evidence regarding how long she looked at Vasquez before identifying him; nor is there any evidence regarding whether she asked any questions before identifying him.

However, defense counsel at trial focused at some length on an event that took place after Aracelis had made her pre-trial identification that calls into question her level of certainty. Specifically, several days after identifying Vasquez at the police precinct, Aracelis telephoned the district attorney to report that she had seen someone who looked like the man who attacked her. Tr. 520–38. She had been walking home from a shopping mall when she saw a group of people across the street. Tr. 524. She thought one of them was the man who attacked her, got very scared, ran home, and called the district attorney. Tr. 521. When the district attorney informed her that Mr. Vasquez was incarcerated, Aracelis calmed down and realized that the person on the street had not been who she thought. Tr. 522. But the fact that she thought a second person was the man who had attacked her does raise a question about the reliability of her prior identification of Vasquez.

### 5. Time Between Crime and Confrontation

Finally, the fact that only one-and-a-half hours had passed before Aracelis made her pre-trial identification is extremely significant. There is no concern that Aracelis simply forgot her attacker's face between the incident and her identification. Nor is there any reason to think her memory would have faded in that brief time. *See Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir.1998) (concluding that three days between the incident and identification was a short enough period that no loss of memory was likely).

In sum, the opportunity she had to view her attacker, her degree of attention, and the brief time between crime and confrontation all lent substantial credence to Aracelis's identification, while the lack of prior descriptions and her subsequent but tenta-

tive identification of a separate individual both cast some doubt on it. Thus, on balance, the traditional five *Biggers/Brathwaite* factors tend to suggest that Aracelis's pre-trial identification was reliable. Indeed, considering these factors alone, the identification may have been independently reliable enough to outweigh "the corrupting effect of the suggestive identification itself." *Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243. The sixth factor makes the analysis even stronger.

### 6. Corroborating evidence of guilt

The most significant corroborating evidence is the employment application Mr. Vasquez dropped as he fled the scene of the crime. Haq saw Vasquez drop the papers while chasing him through the driveway, and they revealed his name and address. Tr. 780. Vasquez did not ultimately deny that he had dropped the papers—instead, he walked into the police station one-and-a-half hours after the crime and told Officer Robinson he had dropped the papers while helping to chase someone. Tr. 588. But Haq never saw a second person assisting in the chase. Nor did Aracelis. And Vasquez never returned to the scene to provide police with information about the person he was supposedly chasing. Indeed, Vasquez's explanation appears to have been a farfetched effort to explain the identifying papers he had dropped after realizing that the police had found them. This is why he sought to suppress the statement. *See infra.* Moreover, not to be discounted is the fact that, although Vasquez was wearing different clothes when Aracelis identified him at the precinct, Vasquez's wife then turned over to the police a shirt that Aracelis and Haq testified looked like the one the attacker had worn.

When these corroborating facts are put together with the five traditional *Biggers* and *Brathwaite* factors, it is clear that "no substantial likelihood of irreparable mis-

identification" existed. *Brathwaite*, 432 U.S. at 116, 97 S.Ct. 2243. The state court's decision to let any degree of uncertainty be determined by the jury was therefore not contrary to, and did not involve an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

### II. Whether there was prosecutorial misconduct warranting relief

Petitioner argues that he is entitled to habeas corpus relief because his "due process right to a fair trial was violated by the prosecutor[']s denial of her stipulation to refrain from introducing the alleged statement made by defendant." Petition, at 6. The statement to which petitioner refers is Vasquez's statement, made when he voluntarily entered the police station, that "he was looking for some papers that he had dropped when he was chasing someone." Tr. 588. Meanwhile, the due process right to which petitioner refers is presumably the right to be free of prosecutorial misconduct found in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (cautioning that while a prosecutor "may strike hard blows, [s]he is not at liberty to strike foul ones."). Again, the state court denied this claim "on the merits," thus triggering review under AEDPA. But it is not even clear that the prosecutor struck a "blow" at all—it surely was not a foul one by constitutional standards. Because the trial at which petitioner claims this prosecutorial misconduct took place was actually petitioner's third trial, some procedural history is necessary.

Before any trial, petitioner moved to suppress as involuntary the statements he had made to Officer Robinson upon entering the precinct, pursuant to *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965). This frivolous mo-

tion was accompanied by a motion to suppress the pre-trial identifications of him made by Aracelis and Haq, pursuant to *United States v. Wade*, 388 U.S. 218, 235–236, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Petitioner argued that the showup identifications were impermissibly suggestive and that the witnesses may have been shown the picture Ms. Vergara had provided before making their identifications. A *Wade/Huntley* hearing was held on December 10, 1997 before Justice Browne in Supreme Court, Queens County. After hearing testimony from Officers Robinson and Detective Falciano, the bulk of which focused on the admissibility of the pre-trial identifications, Justice Browne denied the defendant's motions to suppress in their entirety. *See* H/W Day 2, at 20.

Five months later, in May 1998, a trial commenced before Judge Naro in Queens County Supreme Court. At some point early on, Haq testified that before identifying Vasquez at the precinct, he had been shown Vasquez's picture. This was seemingly at odds with the testimony elicited during the *Wade/Huntley* hearing and it raised a new question about the admissibility of his pre-trial identification. The prosecutor conceded that a portion of Haq's testimony had to be stricken, but Judge Naro ultimately concluded that the only appropriate remedy was a mistrial without prejudice. *See* May 27, 1998 Tr. 2–27. He stated that the best solution was to excuse the jury and start a new case right away. *Id.* at 27.

Directly after the declaration of mistrial and before the second trial had begun, defense counsel moved to reopen the issues that had been litigated at the *Wade/Huntley* hearing five months earlier. *Id.* at 27–29. He argued that, because Haq's testimony was seemingly at odds with Officer Robinson's testimony during the *Wade/Huntley* hearing, where she had stated that she did not show Vasquez's

picture to the complainant, the earlier rulings could not be trusted. *Id.* Specifically, he asked Judge Naro for a new ruling regarding the admissibility of Aracelis's (as well as Haq's) pretrial identification, a new ruling regarding the admissibility of Vasquez's admission to Officer Robinson at the precinct, and a ruling on the admissibility of the shirt recovered from Vasquez's home. *Id.* The district attorney, apparently seeking to "make it simple for the court" volunteered that she would not seek to elicit any testimony from Mr. Haq about his pre-trial identification at the new trial, "which [she] assume[d] will start today." *Id.* at 30. As to the remaining issues, the following exchange took place:

> District Attorney: The statements were made prior to the police officer conducting the showup identification so there can't be any taint before an identification. It hadn't even happened yet. Further, the People didn't seek to introduce them in their case in chief, and finally with regard to the property, it wasn't retrieved—it was retrieved from the defendant and that issue was decided by the court. This court has no grounds to reverse another judge in this courthouse.

> The Court: You are talking about the shirt, I would not disturb Judge Brown's decision on the shirt. I think you have made clear that there will be no out of court identification sought by the People from Mr. Haq when he testifies at the trial.

> District Attorney: That's correct, your Honor.

> The Court: I think that satisfies in my opinion your needs, and I think that's the fair and proper approach to take. There was one other issue.

> Defense counsel: The statement. I think the People have indicated they do

not seek to introduce out of court statements of the defendant; is that correct?

District Attorney: No, I do not, not on the direct case.

*Id.* at 30–31.

At petitioner's second trial, which began immediately after the May 1998 trial had been ruled a mistrial, the district attorney did not raise the statement Vasquez had made to Officer Robinson upon entering the police precinct. But that trial, too, ended in a mistrial when the jury was unable to reach a verdict. *See* Proceedings, dated June 9, 1998. In part because petitioner obtained new counsel after the second trial, a third trial (from which petitioner now seeks relief) was not held until January 1999.

In her opening statement at the third trial, the district attorney told the jurors that they "will hear that [the defendant] told Officer Robinson, 'I dropped some papers while I was helping some guy chase some guy.'" Tr. 236. Defense counsel objected, arguing that the district attorney had agreed to not elicit testimony about Vasquez's statements to Officer Robinson. Tr. 239–93. He claimed that the district attorney's sudden use of the statements caught him by surprise and constituted prosecutorial misconduct. Tr. 242. Specifically, he claimed that there had been a ruling or a stipulation regarding the statement; because he had not been defense counsel for the prior trials, however, he could not say with certainty where any such ruling could be found in the record. After a long colloquy with counsel and a searching look at the record from the prior trials, the trial judge ruled as follows:

> [T]he defendant moves for a mistrial based on prosecutorial misconduct. The defendant contends that the People made reference to a statement, or statements attributable to the defendant, which were the subject of a *Huntley* Hearing conducted by Judge Browne.

Judge Browne denied the suppression of that statement to the effect that the defendant dropped the papers during the chase.

As a consequence, the People were entitled to elicit this statement from Police Officer Robinson at the trial. Notwithstanding the fact that the People … apparently elected not to develop this subject matter at the previous trials, defense counsel interpreted the minutes of the previous trials to create the impression that there was a ruling precluding the People from eliciting this very subject matter.

After reading all of the relevant minutes, this Court finds that the defendant's argument, while facially credible, lacks merit. This Court can find no ruling precluding the People, made either by Judge Browne or by this Court.

Tr. 292–93.

■ There is no clear evidence that any stipulation was entered into by the parties regarding the admissibility of Vasquez's admission to Officer Robinson that would govern future trials. *See People v. White,* 73 N.Y.2d 468, 476, 541 N.Y.S.2d 749, 539 N.E.2d 577 (1989) (defining "stipulation" as an "agreement, admission, or concession made in a judicial proceeding by the parties thereto or their attorneys, in respect of some matter incident to the proceeding, for the purpose, ordinarily, of avoiding delay, trouble and expense"). Indeed, with regard to the district attorney's intent in trials beyond the one that would immediately follow the initial mistrial, the record was silent. *See People v. Saunders,* 166 A.D.2d 546, 560 N.Y.S.2d 828 (2d Dep't 1990) (recognizing that "[a]lthough the prosecutor at this trial would have been bound by the prosecutor's stipulation at the first trial not to elicit in-court identifications of two eyewitnesses the record is equivocal as to whether the attorneys at

the first trial in fact stipulated that the two eyewitnesses would be precluded from making an in-court identification at all subsequent criminal proceedings"). Thus, she was not bound at the third trial by her decision and disclosure regarding the second trial.

■ Even if there had been a stipulation regarding petitioner's statement, that fact alone would still have been far from sufficient to warrant a reversal on habeas corpus. A prosecutor may be permitted to withdraw from a stipulation, particularly when the defense counsel has sufficient time to adjust his case to prepare. Here, the prosecutor announced her intention to rely on Vasquez's statement during her opening statement, before defense counsel had even addressed the jury. Moreover, the existence of this one piece of evidence was no surprise to defense counsel—no new investigation was required and no overarching change in trial strategy was needed. In short, if there was any misconduct here, it was harmless in light of "the overall strength of the prosecution's case," *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir.1996), and the fact that petitioner has never claimed or demonstrated that he was actually prejudiced by the allegedly unfair surprise. Defense counsel had ample time to adjust his case and there is certainly no reason to think that the prosecutor's change in strategy had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted).

### III. Whether the victim suffered a "physical injury"

■ Petitioner argues that his constitutional right to have each element of a crime proven beyond a reasonable doubt was violated because his victim did not suffer a "physical injury" as was required

for burglary in the first degree and assault in the third degree. The Appellate Division explicitly ruled on this claim. It wrote:

> Viewing the evidence in the light most favorable to the prosecution (*see People v. Contes*, 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt of burglary in the first degree and assault in the third degree beyond a reasonable doubt, as the evidence established the nature of the victim's injury, the way it was inflicted, and the duration of the pain. This provided the jury with a ready and sufficient basis to determine that the victim suffered "substantial pain" as a result of the defendant's attack (Penal Law § 10.00[9]; *see People v. Brown*, 243 A.D.2d 749, 662 N.Y.S.2d 934; *People v. Boles*, 198 A.D.2d 837, 604 N.Y.S.2d 412; *People v. Coward*, 100 A.D.2d 628, 473 N.Y.S.2d 591).

*People v. Vasquez*, 297 A.D.2d 297, 298, 745 N.Y.S.2d 920 (2d Dep't 2002).

The constitutional standard for determining the sufficiency of the evidence is that a conviction is constitutional if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). And that standard "must be applied with explicit reference to the substantive elements of the criminal offence as defined by state law." *Id.* at 324, n. 16, 99 S.Ct. 2781. Here, the facts included a victim testifying that she was hit in the mouth and a police officer testifying that the victim was bleeding from the mouth after the attack. The state court did not unreasonably conclude that such facts could permit a finding of "physical injury" under its own statutes

and precedents. Indeed, I defer to the state court's interpretation of its own law, and find nothing about its conclusion that would warrant habeas corpus relief.

### IV. Whether testimony about petitioner's beige shirt violated the Confrontation Clause

█ Finally, petitioner argues that his rights under the Confrontation Clause were violated "when the police officer gave hearsay testimony about the shirt which was admitted in evidence and statements regarding said shirt which were allegedly made by petitioner's wife." Petition, at 6. Once again, petitioner raised this claim in his brief to the Appellate Division, and the state court found it "without merit." *People v. Vasquez*, 297 A.D.2d at 298, 745 N.Y.S.2d 920.

> Petitioner contends:
>
> The police officer testified at trial that the shirt given to her by the petitioner's wife was the shirt the petitioner was wearing "at the time of the incident" and the shirt he was wearing "on that morning." Allowing this testimony made the petitioner's wife an unsworn witness against the petitioner in violation of the petitioner[']s rights to confront his accusers.

Petition at 6. But this allegation is factually inaccurate and incomplete. The relevant testimony begins with Officer Torres. After testifying about responding to the 911 call, finding Aracelis hysterical, and visiting the apartment Vasquez had listed on his employment application, Officer Torres explained that Vasquez and his wife, Lucy Vergara, came to the precinct. Then Officer Torres gave the following testimony:

> Prosecution: Did you have the opportunity to leave the precinct with Ms. Vergara?
>
> Officer Torres: Yes.
>
> Prosecution: Where did you go?

Officer Torres: Back to where she lives.

Prosecution: For what purpose?

> Defense counsel: Objection, Judge.
>
> The Court: For what purpose. Sustained.

Prosecution: What did you do when you got to Ms. Vergara's home?

> Defense counsel: Objection.
>
> The Court: What did you do when you got to Ms. Vergara's home. I will allow that. You went back with her to the apartment with Ms. Vergara?

Officer Torres: Yes.

> The Court: I will allow that.

Prosecution: What did you do when you got back to Ms. Vergara's home?

Officer Torres: Ms. Vergara went upstairs and I stayed downstairs.

Prosecution: Did she come back downstairs?

Officer Torres: Yes.

Prosecution: What happened when she got back downstairs?

Officer Torres: She handed me a shirt.

Prosecution: What shirt did she hand you?

Officer Torres: A beige shirt.

Prosecution: What shirt was this?

Officer Torres: This was the shirt that Mr. Vasquez—Defense

> Counsel: Objection.
>
> The Court: You can't say that. She handed you a beige shirt. You have answered that. Anything beyond that as to be, sustained.

Prosecution: Officer Torres, when she went up to the apartment, did she have the beige shirt?

> Defense Counsel: Objection, Judge.
>
> The Court: I will let her answer that. She was in a position to see that. Did she have a beige shirt when she went up?

Officer Torres: No.

Prosecution: ... Officer Torres, you have been handed what has been marked as People's Exhibit # 2 for identification. Do you recognize that?

Officer Torres: Yes.

Prosecution: What is it?

Officer Torres: It's the shirt that Ms. Vergara handed to me.

. . .

Prosecution: I would ask you to take a look and tell me if it is in the same condition as when it was handed to you by Ms. Vergara? ...

Officer Torres: Yes.

Tr. 319–22.

On cross-examination, defense counsel asked Officer Torres a series of further questions about the shirt, apparently designed to discredit the testimony that the shirt in question had actually been retrieved from petitioner's house. Then, on re-direct, these questions and answers were given:

Prosecution: [W]hen you went back to that apartment with Ms. Vergara, what shirt was she asked to retrieve?

Defense Counsel: Objection, Judge.

The Court: I will allow that over your objection.

Officer Torres: **The shirt that defendant was wearing at the time of the incident?**

Defense Counsel: Objection, your Honor, move to strike. I need to approach with the Reporter.

Tr. 370 (emphasis added). At this point, for the first time, defense counsel argued that this testimony had the effect of making Vergara an absent witness against defendant. He claimed: "They put the implication that Lucy Vergara volunteered and said I'll give you the shirt he was wearing at the time of the incident. She made her a witness against the defendant, which she is not." Tr. 371. After discussion with counsel, the trial judge directed that the last question and answer was to be stricken and that the jury was to disregard it. Tr. 373.

Later, however, Officer Robinson would also testify about the shirt. Specifically, the following exchange took place:

Prosecution: Officer Robinson, following the arrest of the defendant, and without telling us anything that was said, did you have the opportunity to have a conversation with Lucy Vergara in the precinct?

Officer Robinson: Yes.

Prosecution: And following that conversation what did you do?

Officer Robinson: I asked my partner Ivette Torres to go back.

Defense Counsel: Objection.

The Court: Wait a second please. You asked Torres—you had a conversation with your partner Officer Torres; is that correct.

Officer Robinson: I had a conversation with Lucy Vergara.

The Court: You had a conversation with Lucy Vergara. At what point was this at 1:59 or shortly?

Officer Robinson: Right this was after the arrest in the precinct that I had a conversation with her.

The Court: All right. After that conversation—

Prosecution: What did you do with respect to Officer Torres?

Defense Counsel: Objection, your Honor.

Prosecution: Without telling us what you said, what did she do?

The Court: What did Officer Torres do at that point. That's the question. I will allow that.

Officer Robinson: She went back.

Defense Counsel: Objection, your Honor.

The Court: No. Did you see what she did?

Officer Robinson: No.

Prosecution: Had you instructed her to go somewhere Officer Robinson?

Officer Robinson: Yes.

Prosecution: And where did you instruct her to go?

Defense Counsel: Objection.

The Court: She can tell us what she instructed her to do.

Officer Robinson: I instructed her to go back to the house and retrieve the shirt.

Defense Counsel: Objection, your Honor.

The Court. That's what you instructed her. I will allow it over your objection.

Prosecution: Could you complete your answer?

Officer Robinson: **I instructed her to go back to the house and retrieve the shirt that the defendant was wearing that morning.**

Tr. 593–94 (emphasis added). Officer Robinson later confirmed that Officer Torres returned with the beige shirt that was produced at trial. Tr. 595–96. And after Aracelis and Haq testified that the shirt looked like the one Vasquez had been wearing during the attack, the trial judge admitted the shirt in evidence, stating that "[a]ny uncertainty as to his identification of the shirt, goes to the question of weight." Tr. 792.

■ The police officers' testimony does not provide a basis for habeas corpus relief. First, Officer Torres's statement that Ms. Vergara was asked to retrieve the "shirt that defendant was wearing at the time of the incident" was stricken from the record and the jury was specifically asked to disregard it. Tr. 370, 373. Because we presume that, in such a case, the jury was able to follow the judge's instructions and refrain from drawing an inference against the defendant, any error that took place in letting the jury hear the statement before it was stricken was harmless. *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process."). Second, Officer Robinson's testimony regarding her instruction to Officer Torres was not hearsay. It was not offered to show that the shirt Officer Torres was in fact the shirt Vasquez had been wearing that morning, or even that Officer Torres had gone to retrieve it, facts that Officer Robinson could not have known. Rather, as the district attorney argues, it was offered to establish the logical step in the police investigation. The same can be said of Officer Torres's testimony regarding Ms. Vergara's production of the shirt. When Officer Torres described Ms. Vergara going up the stairs to Vasquez's apartment and returning with a beige shirt, the testimony was admitted to explain where the shirt was found—not what the shirt represented.

The beige shirt that was ultimately admitted in evidence was admitted with the following foundation: Officer Torres's testimony that it was retrieved from petitioner's apartment; Officer Torres's testimony that it was in the same condition at trial as it had been when it was retrieved; and Aracelis's and Haq's testimony that it resembled the shirt petitioner had been wearing during the crime. The only arguable Confrontation Clause violation was the possible suggestion that Ms. Vergara (who did not testify) told the investigating officers that petitioner had been wearing a beige shirt that morning. *See Mason v.*

*Scully,* 16 F.3d 38, 42–43 (2d Cir.1994) ("To implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly but may contain an accusation that is only implicit."). The circumstances surrounding the police officers seeking the shirt arguably implied that, by producing the shirt, Ms. Vergara made such an indication, giving Vasquez a right to confront her at trial. But this is not a case where the feared implication was so clear that the jury would have necessarily credited it, particularly considering that the jurors were instructed to consider only the evidence presented. Indeed, this case is far removed from a case like *Mason v. Scully,* where the prosecutor "sought to elicit" implied accusation from a defendant's accomplice by having a police officer testify that he spoke to the accomplice and subsequently began looking for defendant. *Id.* at 40. In that case, where the prosecutor then "emphasized [the implied accusation] in his summation," the jury would have almost surely concluded that the defendant's absent accomplice implicated him. *Id.* at 44. Here, any implied accusation was of a passing and vague nature, not rising to the level of a Confrontation Clause violation. Thus, the state court did not unreasonably apply clearly established federal law by finding petitioner's appeal on this ground "without merit." *People v. Vasquez,* 297 A.D.2d at 298, 745 N.Y.S.2d 920.

█ Finally, even if there were a Confrontation Clause error here, it would be harmless. Petitioner's beige shirt was only one piece of evidence in a strong case presented by the prosecution. It added little to the victim's identification of Vasquez, the discovery of his employment application at the scene of the crime, and his far-fetched admission upon entering the precinct. More importantly, the implication that Ms. Vergara had retrieved the shirt and thereby accused petitioner of wearing it (which is the only arguable Con-

frontation Clause violation) added little probative value to the shirt. The shirt was significant even without this implied accusation because witnesses identified it as resembling the shirt petitioner had worn during the crime. Under these circumstances, petitioner cannot possibly show that any Confrontation Clause error surrounding admission of the shirt had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. at 623, 113 S.Ct. 1710.

### Conclusion

The petition for a writ of habeas corpus is denied.

**SO ORDERED.**